UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SANDRA ROJAS,

                                    Plaintiff,                    No. 07-CV-6250 CJS

        -vs-
                                                                  DECISION AND ORDER

THE ROMAN CATHOLIC DIOCESE OF
ROCHESTER, THE PASTORAL CENTER
OF THE ROMAN CATHOLIC DIOCESE OF
ROCHESTER, and PASTOR PETER
ENYAN-BOADU, Individually,
                                    Defendants.


_____


APPEARANCES

For Plaintiff:                      Christina A. Agola, Esq.
                                    730 First Federal Plaza
                                    28 East Main Street
                                    Rochester, New York 14614

For Defendant the Diocese
of Rochester:                       Brian Laudadio, Esq.
                                    Harris Beach PLLC
                                    99 Garnsey Road
                                    Pittsford, New York 14534

For Defendant Pastor
Peter Enyan-Boadu:                  Charles A. Schiano, Sr., Esq.
                                    The Schiano Law Office
                                    Wilder Building, One East Main Street
                                    Rochester, New York 14614


INTRODUCTION

        This is an action alleging "hostile environment" employment discrimination on the

basis of sex, and retaliation, pursuant to Title VII of the Civil Rights Act of 1964 ("Title

1

VII), as amended, 42 U.S.C. § 2000e *et seq.*, and the New York Human Rights Law ("NYHRL"), Executive Law § 290 *et seq.,* as well as state common-law claims for assault and battery.   Now before the Court are Defendants' motions [#5] [#16] to dismiss the Complaint, pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(1) and 12(b)(6). For the reasons that follow, Defendants' applications under Rule 12(b)(1) are denied, their applications under Rule 12(b)(6) are granted, to the extent that Plaintiff's retaliation claims are dismissed without prejudice, and Plaintiff is granted an opportunity to re-plead her retaliation claims as described below.

BACKGROUND

The following facts, taken from the Complaint, are accepted as true for purposes of this motion.   At all relevant times, Sandra Rojas ("Plaintiff") was employed by the Diocese of Rochester ("DOR") as a Coordinator for Hispanic Migrant Ministry.   It is undisputed that Plaintiff's duties were primarily religious in nature, and that, for purposes of this action, "she should be considered 'clergy.'" (Plaintiff's Memo of Law [#19-2] at 10).

In her capacity as Coordinator of Hispanic Migrant Ministry, Plaintiff worked at the Catholic parish in Brockport, New York, where Defendant Pastor Peter Enyan-Boadu ("Enyan-Boadu") served as pastor.   Plaintiff indicates that Enyan-Boadu was her "co-worker," as opposed to her "supervisor," and she does not indicate that he had any supervisory authority over her. (Complaint [#1] ¶ 31; Pl. Memo of Law [#19-2] at 4).   In July 2006, on three occasions, Enyan-Boadu allegedly made unwelcome sexual advances toward Plaintiff, which included him kissing her and touching her breast.

Approximately three months later, on October 30, 2006, Plaintiff told her supervisor, Bernard Grizard ("Grizard"), DOR's  Director of Parish Support Ministries, that

2

he "need[ed] to take action," because Enyan-Boadu was "making [her] life miserable." (Complaint [#1] ¶ 34).  The Complaint does not indicate that Plaintiff said anything to Grizard regarding sexual harassment.  The following day, October 31, 2006, Plaintiff met with Grizard and Mary Bauer ("Bauer"), who worked in DOR's Human Resources Department.  Plaintiff "started to explain to Bauer about the hostile environment and work conditions in her work place as a result of [Enyan-Boadu's] harassment, but was told by Bauer to "stop . . .  stop . . . stop . . . tell me about it later, I do not want to know about your work environment right now." (*Id*. at ¶ 38).  Bauer then asked Plaintiff to sign a letter of resignation, but Plaintiff refused.  The following day, November 1, 2006, Plaintiff again met with Grizard, and again told him that Enyan-Boadu had "made her life miserable," though, again, the Complaint does not indicate that she said anything about sexual harassment. (*Id*. at ¶  43).  Grizard allegedly then presented Plaintiff with a letter dated October 31, 2006, stating that she had resigned, and told her that her employment would be terminated on November 28, 2006.

On November 2, 2006, Plaintiff sent an email to Grizard, indicating that she was not resigning.  However, on November 9, 2006, Grizard informed Plaintiff that her employment was terminated.  Also on November 2, 2006, Plaintiff sent an e-mail to DOR's Human Resources office, indicating that she "wanted to discuss 'sexual misconduct,'" which appears to have been the first time that DOR received notice of such alleged misconduct involving her. (*Id*. at ¶ 47).  The Human Resources office, though, did not respond until November 30, 2006, when it contacted Plaintiff to perform a "post-termination investigation" of her complaint of sexual harassment. (*Id*. at ¶ 52).  Apparently, however, such post-termination investigation did not proceed, because

Plaintiff's counsel directed DOR to have no contact with her client.[1]

Plaintiff subsequently filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC").  However, on May 1, 2007, the EEOC dismissed the complaint, stating that Plaintiff's "position falls within the ministerial exemption."

On May 14, 2007, Plaintiff commenced the subject action, alleging five causes of action: 1) hostile environment discrimination under Title VII; 2) hostile environment discrimination under the NYHRL; 3) retaliation under Title VII; 4) retaliation under the NYHRL; and 5) assault and battery under New York common law.  With regard to her retaliation claims, the Complaint states that Defendants retaliated against her "by failing to take any remedial action whatsoever in regards [sic] to Plaintiff's complaints of sexual harassment through the creation of a hostile work environment at the hands of Pastor Peter Enyan-Boadu as late as one month prior to her termination." [sic] (Complaint ¶ ¶ 76, 81).

On September 13, 2007, DOR filed its subject motion to dismiss [#5], pursuant to Rule 12(b)(1) and, alternatively, Rule 12(b)(6).  DOR maintains that the Court lacks subject-matter jurisdiction over Plaintiff's Title VII and NYHRL claims, based on the "ministerial exception" arising from the First Amendment to the United States Constitution.  More specifically, DOR contends that the "ministerial exception," a creation of federal common law, "exempts the employment relationship between a religious employer and its ministers from the coverage of employment laws." (DOR Memo at 3).  Therefore, DOR argues, the Court cannot consider any of Plaintiff's Title VII or NYHRL

---

[1]This representation was made by DOR's counsel in open court during oral argument, and was not denied by Plaintiff's counsel.

claims, including her hostile environment claims.  Alternatively, DOR contends that

Plaintiff has failed to state a claim for retaliation, under either Title VII or the NYHRL,

because she has not alleged that she suffered "an adverse employment action." (*Id*. at

4).  In moving to dismiss, DOR did not attempt to assert a defense pursuant to the

Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq*..  To

the contrary, DOR argued that "the RFRA is not applicable in the current case because

there was no governmental action." (DOR Memo at 5, n. 4).  On October 12, 2007,

Defendant Enyan-Boadu, filed a separate Motion to Dismiss [#16], "adopting" DOR's

arguments "by reference."

    On December 18, 2007, Plaintiff filed opposition papers, arguing both that the

"ministerial exception" does not apply to this case, and that the Complaint adequately

pleads claims for retaliation.  More specifically, Plaintiff contends that the ministerial

exception does not apply in Title VII cases, pursuant to *Hankins v. Lyght*, 441 F.3d 96 (2d

Cir. 2006) ("*Hankins*"), which held that a religious freedom defense should be asserted

under RFRA, as opposed to the federal common-law "ministerial exception."  Plaintiff

further maintains that although Defendants might be able to assert a defense under the

RFRA, they have not done so.  In that regard, Plaintiff's counsel specifically stated that

"Defendants have not pled the RFRA as a defense at this juncture." (Agola Declaration

[#19] ¶ 22).  Plaintiff also states that she has adequately pleaded a claim for retaliation,

by alleging that her employment was terminated after she complained about "Enyan-

Boadu's creation of a hostile work environment based on sex." (Plaintiff's Memo of Law at

21).[23]

In reply, DOR states that the "ministerial exception"remains viable in Title VII cases, due to the Supreme Court's decision in *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal et al.*, 546 U.S. 418, 126 S.Ct. 1211 (2006) ("*O Centro Espirita*"), which was decided after *Hankins*. (*See*, Reply Memo at 2) ("[E]ven assuming that the Second Circuit's decision in *Hankins* requires this Court to perform an analysis under the RFRA, the ministerial exception remains applicable to Plaintiff's Title VII claims as a judicially crafted exception to the Act.").  DOR further contends that, regardless of whether the Court applies the ministerial exception or the RFRA, the issue is whether application of Title VII will substantially burden DOR's religious freedom, and if so, whether such application is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest.  On that point, DOR maintains that such application would substantially burden DOR, and that there is no "governmental interest compelling enough to justify the substantial burden that secular employment requirements would place on the self-governance of a church," in light of the Church's "First Amendment right to manage and control its employment relationships with its ministers." (DOR Reply Memo at 7, 3) (quoting *Hankins v. New York Annual Conf. of the United Methodist Church*, 516 F.Supp.2d 225, 236-37 (E.D.N.Y. 2007)).

On February 14, 2008, counsel for the parties appeared before the undersigned

---

[2]*But see, Id*. at 20: "Plaintiff *attempted* in earnest to bring her claims of sexual harassment by Pastor Peter Enyan-Boadu to defendant's attention in October of 2006." (Emphasis added).

[3] *See also*, Agola Declaration [#19] ¶ 30) ("Plaintiff has sufficiently pleaded facts demonstrating she was subject to a hostile environment culminating in her *termination for complaints regarding the same*.") (emphasis added).

for oral argument of the motion.  Following oral argument, on March 21, 2008, the

Second Circuit Court of Appeals issued its decision in *Rweyemamu v.Cote*, 520 F.3d 198

(2d Cir. Mar. 21, 2008) ("*Rweyemamu*").   On March 26, 2008, DOR's counsel submitted a

supplemental letter brief, addressing the *Rweyemamu* decision.  On April 1, 2008,

Plaintiff submitted a responsive letter brief.  The Court has thoroughly considered the

parties' written submissions and the arguments of counsel.

ANALYSIS

*The 12(b)(1) and 12(b)(6) Standards*

Defendants motions to dismiss are made pursuant to Rules 12(b)(1) and 12(b)(6)

of the Federal Rules of Civil Procedure.  It is well settled that,

> [a] case is properly dismissed for lack of subject matter jurisdiction under
> Rule 12(b)(1) when the district court lacks the statutory or constitutional
> power to adjudicate it.  In resolving a motion to dismiss for lack of subject
> matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to
> evidence outside the pleadings.  A plaintiff asserting subject matter
> jurisdiction has the burden of proving by a preponderance of the evidence
> that it exists.

*Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000)(citations omitted).  On the other

hand, In ruling upon a motion to dismiss made pursuant to FRCP 12(b) (6), the Court

must construe

> the complaint liberally, accepting all factual allegations in the complaint as
> true, and drawing all reasonable inferences in the plaintiff's favor. Although
> the pleading standard is a liberal one, bald assertions and conclusions of
> law will not suffice. To survive dismissal, the plaintiff must provide the
> grounds upon which her claim rests through factual allegations sufficient to
> raise a right to relief above the speculative level.

*Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 131 (2d Cir. 2007) (citations and

internal quotation marks omitted).

*Title VII and the NYHRL*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006).

Generally, "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n. 1 (2d Cir.1997), cert den. 522 U.S. 997 (1997). Consequently, unless otherwise noted, references to Title VII below are also intended to refer to the NYHRL. An exception to this general rule is that individual defendants may be held liable under the NYHRL, but not under Title VII. Specifically, "[u]nlike Title VII, [NY]HRL § 296(6) has been construed by the Second Circuit to impose liability on an individual 'defendant who actually participates in the conduct giving rise to a discrimination claim.' " *Lewis v. Triborough Bridge and Tunnel Auth.*, 77 F.Supp.2d 376, 380 (S.D.N.Y.1999) (*citing Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). Under NYHRL § 296(6), an individual co-worker may be held liable as an aider and abettor, assuming that the employer is found liable under § 296(1). In this regard, the individual defendant, who may have personally committed the discrimination, is not held liable for aiding and abetting his own actions, but instead, is deemed liable for aiding and abetting the primary violation by the employer. *Bennett v. Progressive Corp.*, 225

8

F.Supp.2d 190, 214 n. 11 (N.D.N.Y.2002). Another difference between Title VII and the

NYHRL is that, "courts have applied a stricter standard under the state and local human

rights laws with regard to the imputation of liability to an employer, requiring that the

employer encourage, condone, or approve of the conduct." *International Healthcare*

*Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F.Supp.2d 345, 361 (S.D.N.Y.2007)

(citations omitted).

### Hostile Environment Discrimination

To establish a hostile work environment claim, a plaintiff must show that

the harassment was sufficiently severe or pervasive to alter the conditions
of the victim's employment and create an abusive working environment.
The plaintiff must show that the workplace was so severely permeated with
discriminatory intimidation, ridicule, and insult that the terms and conditions
of her employment were thereby altered.  Proving such a claim involves
showing both objective and subjective elements: the misconduct shown
must be severe or pervasive enough to create an objectively hostile or
abusive work environment, and the victim must also subjectively perceive
that environment to be abusive.

In addition, the plaintiff must show that a specific basis exists for imputing
the objectionable conduct to the employer. Where an employee is the victim
of sexual harassment, including harassment in the form of a hostile work
environment, by non-supervisory co-workers, an employer's vicarious
liability depends on the plaintiff showing that the employer knew (or
reasonably should have known) about the harassment but failed to take
appropriate remedial action.  According to two 1998 Supreme Court cases,
*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141
L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118
S.Ct. 2275, 141 L.Ed.2d 662 (1998), this inquiry differs where the
harassment is attributed not to non-supervisory co-workers but to a
supervisor with immediate or successively higher authority over the
employee. *Burlington Indus.*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*,
524 U.S. at 807, 118 S.Ct. 2275. In that circumstance, a court looks first to
whether the supervisor's behavior culminated in a tangible employment
action against the employee.  If it did, the employer will, ipso facto, be
vicariously liable.  If no such tangible employment action is present,
however, an employer will still be liable for a hostile work environment
created by a supervisor unless the employer successfully establishes an

affirmative defense.  That defense requires the employer to show that (a) it
exercised reasonable care to prevent and correct promptly any sexually
harassing behavior, and (b) the plaintiff employee unreasonably failed to
take advantage of any preventive or corrective opportunities provided by the
employer or to avoid harm otherwise.

*Fairbrother v. Morrison*, 412 F.3d 39, 48-49 (2d Cir. 2005) (citations and internal

quotation marks omitted), *abrogated on other grounds by Kessler v. Westchester County*

*Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006).[4]

---

[4]During oral argument, the Court *sua sponte* raised the issue of whether DOR could be held
vicariously liable for the alleged hostile environment created by Enyan-Boadu, where, according to the
Complaint, Enyan-Boadu was Plaintiff's co-worker, and where Plaintiff did not notify DOR of the alleged
harassment until months after it had ceased.  Plaintiff's counsel maintained that DOR could be held liable,
for two reasons.  First, counsel stated that Enyan-Boadu was a supervisor, notwithstanding the allegation
to the contrary in the Complaint.  And second, counsel argued that, upon being notified of the harassment,
DOR was required to take corrective action, even though the harassment had ceased months earlier.
Counsel's first argument lacks merit, inasmuch as both the Complaint in this action, and Plaintiff's
memorandum of law, state that Enyan Boadu was a "co-worker," and that Grizard was her "supervisor."
(*See*, Plaintiff's Memo of Law [#19-2] at 4).  As for counsel's second argument, there is apparent
disagreement among courts. *See*, *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008) ("The [employer]
can be held liable for [a co-worker's] harassment if it 'unreasonably fail[ed] to take appropriate corrective
action reasonably likely to prevent the misconduct from recurring.  The emphasis is on the prevention of
future harassment. *See  McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir.1996). . . . [T]he
emphasis of Title VII in this context is not on redress but on the prevention of future harm. *Faragher v.
City of Boca Raton*, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).") (citation and internal
quotation marks omitted); *see also*, *Beattie v. Farnsworth Middle School*, 143 F.Supp.2d 220, 229
(N.D.N.Y. 1998) ("In Plaintiff's case, it cannot be said that the District failed to stop the alleged harassment
because the harassment was not continuing when brought to the District's attention . . . .  In June 1995,
Plaintiff acknowledges she first expressed unwelcomeness to Levinthal regarding the alleged kisses. That
alleged behavior then ceased. Six months later, and with no intervening harassment alleged, Plaintiff
reported those past kisses . . . .  The District cannot be said to have failed to stop physical behavior that
had already stopped a half a year prior to the time that an internal complaint was communicated, four
months prior to the applicable 300 day statute of limitations window, and that never resurfaced following
the internal complaint. Thus, there being no extension of employer liability, Defendants' motion to dismiss
Plaintiff's sexual harassment claim is accordingly granted."); *Russell v. Roadway Package System, Inc.*,
No. 96 C 3779, 1997 WL 403502 at *7 (N.D.Ill. Jul. 15, 1997) ("Since a hostile work environment did not
continue once plaintiff made her employer aware of the past harassment, there is no basis for holding
defendant liable for sexual harassment."); *but see, Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir.
1995) ("The City's argument reflects a fundamental misunderstanding about Title VII. It is the existence of
past harassment, every bit as much as the risk of future harassment, that the statute condemns.
Employers have a duty to express strong disapproval of sexual harassment, and to develop appropriate
sanctions.") (citations omitted); *Knabe v. Boury Corp.*, 114 F.3d 407, 413-414 (3d Cir. 1997) (Considering
whether the defendant employer had properly investigated and addressed alleged sexual harassment,
even though the plaintiff employee had stopped working the same day that she notified the defendant of
the harassment.).  However, since Defendants have not raised this issue, the Court declines to decide it.

*Retaliation*

To establish a prima facie case of retaliation under Title VII, "a plaintiff must demonstrate participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citations and internal quotations omitted). It is well settled that "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Id.* at 566. In deciding whether a particular activity amounts to "protected activity," "the employment practices opposed by the plaintiff need not have actually amounted to a violation of Title VII. Rather, the plaintiff must have had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001).

To make a prima facie showing of an adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester County Dept. of Soc. Servs.*,  461 F.3d at 207 (*quoting  Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006)).

*The RFRA and the First Amendment*

The "ministerial exception" is part of a larger federal common-law doctrine based on the First Amendment's establishment and free-exercise clauses. *See, Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042  (7th Cir. 2006) ("The exception is based

on the establishment and free-exercise clauses of the First Amendment.") (citations

omitted).  The RFRA, on the other hand, is a statute which states, in relevant part:

> (a) In general. Government shall not substantially burden a person's
> exercise of religion even if the burden results from a rule of general
> applicability, except as provided in subsection (b) of this section.
>
> (b) Exception. Government may substantially burden a person's exercise of
> religion only if it demonstrates that application of the burden to the person--
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental
> interest.

42 U.S.C.A. § 2000bb-1.   In *Hankins*, the Second Circuit, which had never explicitly

recognized the ministerial exception, held that defenses arising from the First

Amendment establishment clause or free exercise clause must be considered under the

framework established by the RFRA. *Id*., 441 F.3d at 102.[5]   Further, *Hankins* stated that

the RFRA "applies to all Federal law," and therefore amends federal discrimination

statutes such as Title VII. *See, Hankins v. Lyght*, 441 F.3d at 109 ("The RFRA is an

amendment to the ADEA[.]").

   However, recently, in *Rweyemamu*, the Second Circuit distinguished *Hankins*, by

holding that the RFRA does not apply where the defendant waives a defense under that

statute.[6]  In finding that the defendant in *Rweyemamu* had waived such a defense, the

---

[5]Holding that, although "some courts had read [the 'ministerial exception'] into various
anti-discrimination laws," the exception "has no basis in statutory text, whereas the RFRA, if applicable, is
explicit legislation that could not be more on point," and that "[g]iven the absence of other relevant
statutory language, the RFRA must be deemed the full expression of Congress's intent with regard to the
religion-related issues before us and displace earlier judge-made doctrines that might have been used to
ameliorate the ADEA's impact on religious organizations and activities."

[6]In dicta, the panel in *Rweyemamu* also noted its doubts about the *Hankins* decision's
"determination that RFRA applies to actions between private parties." *Id*. at 203-204.

Circuit stated:

> [D]efendants never once mentioned RFRA in their motion to dismiss before
> the district court, nor did they ever argue that Title VII substantially burdens
> their religion. Their arguments to the district court were premised entirely on
> the ministerial exception and the Free Exercise Clause's requirement that
> churches be free from government interference in matters of church
> governance and administration. On appeal, defendants' argument is again
> rooted in the First Amendment and the ministerial exception: "The First
> Amendment ... protects employment decisions made by religious
> institutions regarding ministerial employees from governmental oversight,
> including judicial review." Appellees' Br. at 8; *see also id*. at 11-15.
>
> Moreover, defendants' brief states that *Hankins* should not apply because
> "the Diocese has not raised a RFRA defense," and "[t]he provisions of
> RFRA ... may be waived." *Id*. at 18. It goes on to affirmatively assert: "The
> defendants[ ] explicitly waive a RFRA defense in this matter." *Id*. at 23 n. 7
> (emphasis added). While the last section of their brief contains an argument
> that Title VII imposes a substantial burden on their exercise of religion, *see
> id*. at 22-25, defendants were forced to make this argument because
> *Hankins* had come down after their district court proceedings. Recognizing
> *Hankins*'s holding that a RFRA defense might be considered
> notwithstanding an express waiver by the church, defendants plainly
> presented their RFRA based argument to cover the possibility that this
> panel would decide to follow the *Hankins* panel's analysis: "However, and in
> light of the *Hankins* decision, should this Court find that the defendants[ ]
> implicitly raise [a RFRA] defense, the defendants include here the analysis
> of said defense." *Id*. at 23 n. 7; *see also id*. at 22 (presenting a RFRA
> analysis only "[s]hould the *Hankins* decision control this case").  Because
> the defendants explicitly waived any defense based on a violation of RFRA
> after they became aware of *Hankins*, we find that they executed an effective
> waiver of a known right.

*Id*., 520 F.3d at 204 (citations omitted).  Having found that the defendants had waived

any RFRA defense, the Circuit stated that it was unnecessary to "further address

*Hankins*'s treatment of RFRA." *Id*.

The Circuit Court in *Rweyemamu* then expressly adopted the ministerial exception.

*Id*. at 207 ("Presented with this occasion to formally adopt the ministerial exception, we

affirm the vitality of that doctrine in the Second Circuit.").  In that regard, the court noted

that, "[s]ince at least the turn of the century, courts have declined to interfere with

ecclesiastical hierarchies, church administration, and appointment of clergy." *Id*. at 204-

205 (citations omitted).  The court went on to state that,

> [t]he Free Exercise Clause protects a church's right to decide matters of governance and internal organization.  Some employees have only religious duties. Others may be lay employees of a religious organization.  Still others may have both secular and religious duties.  The more "pervasively religious" the relationship between an employee and his employer, the more salient the free exercise concern becomes.
>
> Circuit courts applying the ministerial exception have consistently struggled to decide whether or not a particular employee is functionally a "minister." While we agree that courts should consider the "function" of an employee, rather than his title or the fact of his ordination, we still find this approach too rigid as it fails to consider the nature of the dispute. As we noted in *DeMarco* [*v. Holy Cross High School*, 4 F.3d 166 (2d Cir. 1993)], a lay employee's relationship to his employer may be "so pervasively religious" that judicial interference in the form of a discrimination inquiry could run afoul of the Constitution. *See* [*Id*.] at 172. At the same time, however high in the church hierarchy he may be, a plaintiff alleging particular wrongs by the church that are wholly non-religious in character is surely not forbidden his day in court. The minister struck on the head by a falling gargoyle as he is about to enter the church may have an actionable claim.

*Id*. at 208.  On this point, the court further stated that, "although its name might imply an

absolute exception, it is not always a complete barrier to suit; for example, a case may

proceed if it involves a limited inquiry that, "combined with the ability of the district court to

control discovery, can prevent a wide-ranging intrusion into sensitive religious matters."

*Id*. at 207 (*quoting Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 950 (9th

Cir.1999)).  The court concluded that, because the claims of the priest-plaintiff in

*Rweyemamu* turned on issues of Catholic doctrine, his claims under Title VII were

properly dismissed pursuant to Rule 12(b)(1). *Id*. at 209-210.

14

Applying all of the foregoing applicable legal principles to the facts of the instant case, the Court finds, at the outset, that Defendants have waived any defense under the RFRA.  As discussed above, in moving to dismiss, Defendants expressly stated that they were not relying on the RFRA, because they did not believe that it was applicable in this case.  Moreover, although DOR's reply brief discussed the RFRA, in response to Plaintiff's arguments that any defense had to be made under the RFRA in light of *Hankins*, DOR maintained that, even if the RFRA was applicable, that the ministerial exception still applied, in light of *O Centro Espirita*.  And during oral argument, DOR's counsel refused to concede that the Court had to apply the RFRA, even in light of *Hankins*.  For all these reasons, the Court finds that although Defendants have clearly waived any defense under the RFRA, they are nevertheless entitled to pursue a ministerial exception defense.

However, applying the ministerial exception, the Court finds that Defendants' motions must be denied at this stage of the litigation, pursuant to Rule 12(b)(1).[7]   In that regard, it is clear that Plaintiff is a "minister" within the meaning of the ministerial exception.  But, according to *Rweyemamu*, this Court must also consider "the nature of the dispute" before deciding whether the ministerial exception applies.  Here, the "dispute" arises from DOR's decision to terminate Plaintiff's employment, which Plaintiff characterizes as being retaliatory.  Unfortunately, though, the Complaint gives no information about the stated reasons for the termination of Plaintiff's employment, nor

---

[7]The Second Circuit has indicated that motions to dismiss involving the ministerial exception are properly addressed as challenges to the court's subject matter jurisdiction under Rule 12(b)(1). See, *Rweyemamu v. Cote*, No. 3:05CV00969WWE, 2006 WL 306654 at * 4 (D.Conn. Feb. 8, 2006) ("[W]e find that we do not have subject matter jurisdiction over the present case."), *aff'd* 520 F.3d 198 (2d Cir. 2008).

15

have Defendants offered any explanation.  Consequently, the Court cannot determine whether the dispute is religious in nature.  Consequently, the instant case is distinguishable from the situation in *Rweyemamu*, in which the plaintiff priest purportedly was dismissed because he "was not sufficiently devoted to ministry." *Rweyemamu*, 520 F.3d at 200.  The court in *Rweyemamu* held that it could not consider whether such reason was false and pretextual "without impermissible entanglement with religious doctrine." *Id*. at 209.  In the instant case, the Court has no idea why DOR terminated Plaintiff's employment, and therefore it cannot determine whether an investigation into Plaintiff's dismissal from employment would involve any entanglement with religious doctrine.

        To the extent that Defendants are maintaining that a court may never inquire into a church's stated reasons for terminating a minister,[8] that argument appears to have been rejected by *Rweyemamu*. *See, Id*. at 209 ("We therefore conclude, based on the facts of

---

        [8]*See*, DOR's Memorandum of Law at 9, citing *Elvig* for the proposition that a "church cannot be required to articulate a justification for its decision to retain or terminate a minister."  DOR is correct that in *Elvig*, the Ninth Circuit appears to have taken an expansive view of the ministerial exception, with regard to the hiring and firing of ministers. *See, Elvig*, 375 F.3d at 961 ("A church's selection of its ministers is unfettered, and its true reasons - whatever they may be - are therefore unassailable.").  Similarly, in *Rweyemamu V. Cote*, 2006 WL 306654 at * 3,  the District Court for the District of Connecticut stated broadly that, "If a suit involves an employment decision by a church with respect to one of its ministers, courts lack jurisdiction."  Significantly, in that regard, the District Court did not discuss the Diocese's stated reason for terminating Father Rweyemamu's employment.  On appeal, the Second Circuit could have simply affirmed the District Court's decision on the basis that it involved an employment decision involving a minister.  Instead, however, the Circuit Court discussed the reasons why the Diocese had terminated Father Rweyemamu's employment, and affirmed the decision "based on the facts of this case - in particular, the nature of Father Justinian's duties *and the basis for his dismissal*," which was religious in nature. Rweyemamu, 520 F.3d at 209. (Emphasis added). This Court interprets that holding to mean that, in this Circuit, the ministerial exception does not necessarily apply to claims involving the hiring or firing of a minister, unless the hiring or firing involves issues of religion. In that regard, the Second Circuit's interpretation of the ministerial exception appears to be narrower than that of other courts. *See, e.g., Tomic V. Catholic Diocese of Peoria*, 442 F.3d 1036, 1038 (7th Cir. 2006) ("Even if the suit does not involve an issue of religious doctrine, but concerns merely the governance structure of the church, the courts will not assume jurisdiction if doing so would interfere with the church's management.").

this case - in particular, the nature of Father Justinian's duties *and the basis for his dismissal* - that the ministerial exception bars Father Justinian's Title VII claim.") (emphasis added).  Defendants' 12(b)(1) motions are therefore denied as to the retaliation claims.

Similarly, at present there is no evidence to support Defendant's argument that consideration of Plaintiff's hostile environment claims would necessarily involve entanglement with religious doctrine.  Regarding this matter, Defendants do not claim that the alleged harassment had anything to do with the religious doctrine of the Catholic Church.  Instead, they maintain that DOR's potential vicarious liability could not be determined without "penetrating discovery and microscopic examination by litigation of the Diocese's disciplinary procedures and subsequent responsive decisions." (DOR Memo of Law at 9-10) (*quoting Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 976 (9th Cir. 2003) (Kleinfeld, J., dissenting) (internal quotation marks omitted).  However, there is no *per se* rule in that regard.  As explained in *Rweyemamu*, the ministerial exception "it is not always a complete barrier to suit; for example, a case may proceed if it involves a limited inquiry that, "combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive religious matters." *Id*. at 207 (*quoting Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 950 (9th Cir.1999)). The Court has no facts before it from which it could conclude that Plaintiff's hostile environment claim would violate DOR's First Amendment rights.  Accordingly, Defendants' applications to dismiss the hostile environment claims pursuant to Rule 12(b)(1) are denied.

Finally, Defendants contend that the Complaint fails to state actionable claims for

17

retaliation under Rule 12(b)(6), since the alleged retaliatory act does not, as a matter of law, qualify as a "materially adverse" action, meaning an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."*Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d at 207 (*quoting Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006)). In this regard, as discussed earlier, the Complaint states that Defendants retaliated against Plaintiff "by failing to take any remedial action whatsoever in regards [sic] to Plaintiff's complaints of sexual harassment through the creation of a hostile work environment at the hands of Pastor Peter Enyan-Boadu as late as one month prior to her termination." [sic] (Complaint ¶ ¶ 76, 81). To the extent that Plaintiff is alleging that the materially adverse retaliatory act was DOR's alleged failure to take remedial action, the Court agrees that the allegations fail to state a claim for retaliation. However, the above-quoted language also contains a reference to the termination of Plaintiff's employment, and Plaintiff's counsel contends, in opposition to the motion to dismiss, that "Plaintiff alleges that [she] was terminated in writing by the defendant [sic] in retaliation for her complaints of Pastor Peter Enyan-Boadu's creation of a hostile work environment based on sex." (Plaintiff's Memo of Law at 21). Regardless of what Plaintiff might have intended to allege, the Complaint, as currently drafted, does not allege that DOR retaliated against her by terminating her employment. Accordingly, Defendants applications to dismiss the retaliation claims under Rule 12(b)(6) are granted. Nevertheless, "this circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." *Porat v. Lincoln Towers Community Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006). Therefore, the Court will allow Plaintiff an opportunity to amend her complaint, for the

limited purpose of clarifying that the alleged materially adverse retaliatory act was the termination of her employment.

CONCLUSION

Defendants' applications [#5][#16] are denied in part and granted in part as follows: Their applications under Rule 12(b)(1) are denied, their applications under Rule 12(b)(6) and granted to the extent that Plaintiff's retaliation claims are dismissed without prejudice, and Plaintiff is granted an opportunity to re-plead her retaliation claims. Plaintiff shall file and serve such amended complaint within 30 days of the date of this Decision and Order.

SO ORDERED.

Dated: Rochester, New York
        May 19, 2008

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge