_____

SANDRA ROJAS,

                                  Plaintiff,                     No. 07-CV-6250 CJS

      -vs-

                                                      DECISION AND ORDER

THE ROMAN CATHOLIC DIOCESE OF
ROCHESTER, THE PASTORAL CENTER
OF THE ROMAN CATHOLIC DIOCESE OF
ROCHESTER, and PASTOR PETER
ENYAN-BOADU, Individually,

                                   Defendants.

_____

APPEARANCES

| | |
|---|---|
| For Plaintiff: | Christina A. Agola, Esq.<br>730 First Federal Plaza<br>28 East Main Street<br>Rochester, New York 14614 |
| For Defendant the Diocese<br>of Rochester: | Daniel J. Moore, Esq.<br>Joshua D. Steele, Esq.<br>Harris Beach PLLC<br>99 Garnsey Road<br>Pittsford, New York 14534 |
| For Defendant Pastor<br>Peter Enyan-Boadu: | Charles A. Schiano, Sr., Esq.<br>The Schiano Law Office<br>Wilder Building, One East Main Street<br>Rochester, New York 14614 |

INTRODUCTION

This is an action alleging "hostile environment" employment discrimination on the basis of sex, and retaliation, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, and the New York Human Rights Law ("NYHRL"), Executive Law § 290 *et seq.,* as well as a state common-law claim for assault and battery.  Now before the Court are Defendants' motions [#51] [#52] for summary judgment on the Title VII and NYHRL claims.  For the reasons that follow, the applications are granted, and the remaining state-law claim is dismissed pursuant to 28 U.S.C. § 1367(c).

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case, viewed in the light most-favorable to Plaintiff.  At all relevant times, Sandra Rojas ("Plaintiff") was employed by the Diocese of Rochester ("DOR") as a Coordinator for Hispanic Migrant Ministry.  Plaintiff's immediate supervisor at the DOR was Bernard Grizard ("Grizard"), who was DOR's Director for Parish Support Ministries.  Plaintiff worked directly for DOR's Office of Migrant Ministries, which had four regional offices.[1] Plaintiff was assigned to the northwest Monroe County regional office, located in Brockport, New York.  In that capacity, Plaintiff had an office at the Nativity Catholic parish ("Nativity") in Brockport, where Defendant Pastor Peter Enyan-Boadu ("Enyan-Boadu") served as parochial vicar, or pastor.  DOR and Nativity are separate corporations, and the Office of Migrant Ministries was permitted to have an office at the

---

[1]Bernard Grizard Deposition at 9.

parish through an agreement with Nativity. Plaintiff's duties included scheduling

Hispanic Masses at the parish, which were presided over by Spanish-speaking priests.

Plaintiff also had permission to use the church for other Migrant Ministry observances,

provided that they did not conflict with parish events. Throughout the record, Plaintiff

complains that Enyan-Boadu had a dictatorial management style and was

condescending toward women. Plaintiff also indicates that Enyan-Boadu frequently

complained to her about issues such cleaning the church building after Hispanic

Masses, locking doors, and turning off lights.

During her employment Plaintiff received DOR's employee handbook, which

contains a sexual harassment policy, and she admits that she read it. Specifically,

Plaintiff acknowledges receiving copies of DOR's employee handbook on May 5, 2004

and on August 8, 2006.[2]  The handbook that Plaintiff received in August 2006 is dated

July 2006, and states, in pertinent part:

> HARASSMENT
> Harassment includes, but is not limited to:  the creation of an intimidating
> or hostile working environment, behavior that is not welcome, behavior
> that is offensive or abusive . . . .  This policy also prohibits harassment
> against all legally protected classes including . . .  sex [and] national origin
> . . . .  Physical harassment refers to pushing, hitting or other offensive
> behavior . . . . Verbal abuse refers to derogatory or degrading verbal
> comments. . . .
>
> SEXUAL HARASSMENT
> Sexually oriented acts or sex-based conduct have no legitimate business
> purposes.  All employees must refrain from sexual harassment of anyone.
> In addition, sexual harassment includes, but is not limited to:  unwelcome

---

[2]On August 8, 2006, Plaintiff signed a receipt indicating that she had received DOR's Employee Handbook, and added this handwritten statement:  "I signature this document because my boss is nice and he asked me to do it.  But I strongly disagree with the document." [#53-9] at 34.  The Court observes that Plaintiff apparently signed this receipt during her annual performance review with Grizard on August 8, 2006, and that she had no difficulty understanding that Grizard was her "boss."

sexual advances . . . .   Specific examples of sexual harassment include . .
. uninvited touching.

REPORTING A CLAIM
Employees who believe they have been the subject of harassment should
report their charge immediately to Human Resources, which is
responsible to promptly and thoroughly investigate all complaints.

CONFIDENTIALITY AND RETALIATION
It is the intention of the Pastoral Center that any reporting employee or
employee participating in the investigation of any harassment complaint
will not be retaliated against in any way.

[#53-9] at 26-27.  Also, in Mary 2003, Plaintiff attended a DOR workshop in sexual

misconduct. [#53-9] at 29.  Plaintiff indicates that she read DOR's sexual harassment

policies, but thought that they only applied to sexual harassment of children.  Pl.

Exhibits Vol. I, Ex. A at 65-66.

On Saturday, October 28, 2006, Plaintiff was in the process of decorating the

Nativity parish altar for a Hispanic Mass celebrating the traditional Mexican Dia de los

Muertos ("Day of the Dead"), which coincides with the Catholic feast days of All Saints'

Day and All Souls Day.  Enyan-Boadu, upon seeing the decorations, told Plaintiff that

she needed to change them.  In this regard, Enyan-Boadu maintains that he told

Plaintiff that the decorations were too big and obscured the pulpit, while Plaintiff

indicates that Enyan-Boadu said only that he did not like them.  In any event, Plaintiff

became upset because she felt that Enyan-Boadu did not respect her Mexican culture.

Plaintiff removed the decorations from the church entirely, and took them instead to the

nearby Newman Center at  State University of New York ("SUNY") Brockport.  The

following day, Sunday, October 29th, Plaintiff conducted a prayer service and distributed

consecrated hosts at the Newman Center.  However, Plaintiff did not arrange for a

priest to say Mass at the Newman Center, and consequently the Hispanic congregation could not attend Mass in Spanish, although she took it upon herself to distribute communion. Plaintiff admits that she was not authorized to move the prayer service or to distribute communion.

Early the next day, October 30, 2006, Plaintiff called Grizard and told him that he would probably receive a complaint about her from Enyan-Boadu, concerning the events of that weekend. Plaintiff explained what she had done, and Grizard indicated that she was not authorized to move the prayer service to the Newman Center, or to distribute Communion. There is no indication, though, that Grizard intended to take disciplinary action against Plaintiff. Grizard Dep. at 80, 88. Instead, Grizard indicates that he set up a meeting later that day in Brockport between himself, Plaintiff, and Enyan-Boadu, to address the friction between Plaintiff and Enyan-Boadu. Plaintiff met Grizard and Enyan-Boadu that day, and also met with Grizard and others during the following days. As will be discussed further below, the parties sharply dispute what occurred at those meetings.

Briefly, DOR maintains that Plaintiff resigned her position, despite Grizard's attempts to dissuade her from doing so, but later changed her mind. DOR indicates that, at Plaintiff's request, it scheduled meetings with her to discuss her decision to withdraw her resignation, and to discuss the reasons for her resignation. DOR further states, however, that after Plaintiff cancelled the aforementioned meetings and also failed to appear for work, it decided to terminate her employment, effective November 9, 2006. DOR denies that Plantiff ever complained of sexual harassment prior to November 9, 2006. Plaintiff counters that she did not resign. Instead, she maintains

5

that on October 30th, she complained to Grizard about sexual harassment by Enyan-Boadu, and that approximately one week later, on November 9, 2006, DOR fired her in retaliation for her complaints.

According to Grizard, at the meeting on October 30th, between himself, Plaintiff, and Enyan-Boadu, Plaintiff said, "I think I want to resign. I resign. I'm done with this ministry. I want to move on with my life. I just got married. I just want to move ahead." Grizard Dep. at 89. Grizard indicates that he then met with Plaintiff privately, and told her to think it over making a final decision. *Id*. at 89-90. Grizard denies that Plaintiff said anything about sexual harassment, and indicates that her complaints were about her difficulty working with Enyan-Boadu generally:

> She would always – she would regularly complain that Father Peter talked forever, but on this case – she always had a difficult time to accept that Father Peter is the one responsible for the campus [the Nativity Parish Church campus in Brockport] and we were really using the campus, you know. So there was always some tensions about the way we function as a Diocesan ministries [sic] within the parish campus and to accept that. [sic] Even though Father Peter did not have any supervisory or control or power over Sandra Rojas at the same time we still needed to find compromise for the use of the building according to Father Peter's expectations.

Grizard Dep. at 94.

Grizard indicates that, on the following morning, October 31, 2006, he called Plaintiff and asked if she had changed her mind about resigning, and she said, "No. I didn't change my mind. I resign." *Id*. at 90. Grizard states that he then asked Plaintiff to come to his office later that day for a meeting,[3] to finalize her resignation and discuss

---

[3] Grizard indicates in his deposition that the meeting on October 31st included himself, Plaintiff, Mary Bauer, and Fr. Jesus Flores. Grizard Dep. at 90-91. However, this testimony is inconsistent with his

(continued...)

how to "transition the ministries." *Id.* Later that day, Plaintiff met with Grizard and Mary

Bauer ("Bauer"), DOR's Director of Human Resources. Grizard Dep. at 91. According

to Bauer, at the meeting, Plaintiff reiterated that she was resigning, and when Bauer

asked her why she was resigning, Plaintiff stated, "I will write and tell you next week."

Bauer Dep. at 52. Bauer states that Rojas never mentioned Enyan-Boadu during the

meeting. *Id.* Bauer further indicates that she did not prevent Plaintiff from telling her

anything during the meeting. *Id.*

On Wednesday, November 1, 2006, Plaintiff met with Grizard and Father Jesus

Flores ("Flores"), Diocesan Coordinator of DOR's Migrant Ministry. Grizard Dep. at 91,

9. According to Grizard, the purpose of the meeting was to discuss the transition of the

Migrant Ministry program following Plaintiff's resignation. Grizard Dep. at 100. Grizard

indicates that during the meeting, Plaintiff reiterated that she was resigning. However,

Grizard indicates that following this meeting, Plaintiff telephoned him, and told him that

she had not formally resigned, because her resignation was not in writing. Plaintiff also

requested another meeting with Grizard, to talk about unspecified issues that she had

with Enyan-Boadu. Grizard maintains that he scheduled a meeting between himself

and Plaintiff for November 3rd at 11 AM, and that Plaintiff told him she was also going

to set up an appointment with Barbara Pedeville ("Pedeville"), in DOR's Human

Resources Office, to talk about problems that she had with Enyan Boadu:

---

[3](...continued)

notes [#53-11] at 22-23, which indicate that he and Bauer met with Plaintiff on October 31st, and that he and Flores met with Plaintiff on November 1st. The rest of the record also indicates that Bauer and Flores did not meet with Plaintiff at the same time.

On that same day, few hours after our meeting, Sandra called me and told me that she did not formerly resigned [sic] and that she never put in in [sic] writing;  I told her at that point that she repeatedly announced, in the presence of witnesses, that she resigned.  She asked for a meeting with me (for the next day) because I was not aware of different things which occurred between her and Fr. Peter; By reported to me [sic], she said, I would understand better her situation and the reason why she resigned.  We set up the meeting for Friday, November 3rd at 11:00 am in our office, She also told me at that time that she will set up an appointment with Barbara Pedeville to discuss things that happened between Fr. Peter & herself.

[#53-11] at 22-23.

On November 2, 2006 at 8:32 AM, Grizard sent an email message to various DOR staff, with a copy to Plaintiff, informing them of "Sandra's decision to leave her Migrant Ministry position." Pl. Exhibits Vol. II, Ex. C.   Later that morning, Plaintiff telephoned Grizard and again stated that she had not formally resigned.  Grizard indicates that at that time, he did not know whether he would allow Plaintiff to withdraw her resignation:

Q. Now . . . you had a conversation with Ms. Rojas on the morning [of November 2, 2006] and she told you again that she did not formally resign; is that correct?

A. Yes.   And my response was, 'Okay.  So we need to talk about this.  Because my understanding is you resigned and you said it several times, but now you're telling me' - and that was the writing piece. [Indicating that Plaintiff had said that her resignation was not formal because it was not in writing]  I said, 'Even though you didn't put it in writing but [sic] you said it in several instances at different times that you resigned [sic] as a supervisor I take it as a resignation.  Now if you're telling me you didn't formally resign we need to talk about it.'  At that point I honestly don't know what would have happened if these meetings would have occurred.  She may still be working for me.  I don't know.  At that point I left even another opening to say let's talk about it.

Grizard Dep. at 114.  Subsequently that same day, at 1:49 PM, Plaintiff sent an email to Pedeville at DOR's Pastoral Center. Pl. Exhibits Vol. II, Ex. B.  Plaintiff sent the

message as a reply to a previously transmitted general email, which Pedeville routinely sent out alerting staff to "Sexual Misconduct Education/Awareness Workshops."[4] Plaintiff's email message stated: "Hi Barbara, I leave a message in your voice mail. I really need to talk with you as son [sic] as possible. I will have a meeting with Bernard tomorrow at 11:00 AM and I will like to meet you after the meeting with Bernard. The cell of the ministry is 509-4682. Peace, Sandra Rojas." *Id*. Plaintiff indicates that she requested the additional meeting with Grizard, and the meeting with Pedeville, because she wanted to explain what had happened to her:

> Q. Well, again, you testified that there was some urgency [to your request for the meetings with Grizard and Pedeville on November 3rd].
>
> A. Yes.
>
> Q. And why was there?
>
> A. Because I saw Bernard that he ask me to put in writing my complaints and then I see Bernard that he didn't do any action.[5] I saw [Fr.] Jesus in the meeting that – we have this meeting on the 1st and he didn't say anything to me. He didn't say anything to me. He was just quiet and I was expecting at least something like "Sandra, let's go talk. What is going on with you? Tell us more in detail why you say this, why you say that." And they didn't say anything to that, [sic] so I was exasperated to talk to people.

[#53-5] at 13-15, Pl. Dep. at 227-229. Still later on November 2nd, at 9:32 PM, Plaintiff

---

[4]This was the subject heading that Pedeville used when sending out announcements for such training, which she did at least four times per year. Bauer Dep. at 44-45. Plaintiff apparently chose to contact Pedeville by replying to this unrelated email because it contained her email address and/or because it referred to sexual misconduct.

[5]Plaintiff stated under oath that she never gave Grizard such a written complaint:"Q. Okay. So do you have that document? A. No. I didn't – I didn't have time to make it. I just – it was too much painful and cry. Q. So you never did write it out? A. I just start the first sentence, maybe two sentences and just cry." Pl. Deposition (4/7/09) at 230-231. Consequently, her statement that Grizard did not "do anything" in response to her complaint is puzzling, since she admits that she never gave him the complaint. *See, also, e.g.*, Plaintiff's Dep. at 212 ("I believe that I need to give in writing to Bernard what happened because he request that to me[.]")

9

sent Grizard an email, stating:

> I am writing to inform you of the fact that I have NOT formally resigned from my position as a Coordinator of the Hispanic Migrant Ministry. *In our meeting tomorrow, I hope that you will comprehend what has been going on, and hopefully you will understand me a little more.* Thank you for your patience, and May God bless you. In Peace, Sandra Rojas.

Pl. Exhibits Vol. II, Ex. C (emphasis added). With regard to Plaintiff's statement to Grizard that she hoped he would "comprehend was has been going on" after their meeting on November 3rd, which meeting she later cancelled, Plaintiff testified at her deposition as follows:

> Q. Does this [email] in any way refresh your recollection as to whether you actually complained in any way about Father Peter before November 2nd?
>
> A. Yes.
>
> Q. It does?
>
> A. Yes. It's a recollection of what said – what I said to him. In meeting tomorrow I hope you will comprehend what has been going on, because *for me he didn't comprehended [sic] me. He didn't comprehended me. [sic] He didn't.* And then I said I hope that you will understand me a little more. He didn't understand me and I was just looking for compassion that he understood what is going on.
>
> Q. I see. Now, if you go back to Exhibit 19[6], this is consistent then with the statement from November 1st after your meeting with Father Jesus and Mr. Grizard –
>
> A. Yes.
>
> Q. – that you were going to set up a meeting for November 3rd to talk about why you resigned.
>
> A. *Why he didn't understand me that I am sexually assaulted, not why I resign.*

---

[6] Grizard's notes regarding the events of October 28th through November 8th. [#53-11] at 22-23.

[#53-5] at 5, Pl. Deposition at 219 (emphasis added).[7]

Approximately one hour after Plaintiff sent this email to Grizard, Grizard

forwarded Plaintiff's message to Flores, stating:

> There have been new elements added each day re: Sandra's decision;
> She is telling me now (a bit late!) that she did not formally resigned; [sic]
> see email below; she told me also the same thing on the phone this
> morning; She asked for an appointment tomorrow morning at 11:00 am
> with me, saying there are other things she wants to share explaining the
> 'why' of her decision; I agreed to meet with her but I am a bit nervous to
> meet with her alone; especially in light of different things being said each
> day .... 4 ears are better than 2!! I am asking you a big favor: could you
> join us at 11:00 am for this meeting? I would definitevely [sic] feel more
> comfortable. It is at the Pastoral Center. Thanks for letting me know.
> Peace, bernard.

*Id.*, Ex. D. On November 3, 2006, though, Plaintiff cancelled her meeting with Grizard,

and Grizard agreed to reschedule the meeting for November 7th.

Plaintiff, subsequent to her email to Pedeville on November 2nd, scheduled a

meeting with Pedeville on November 6th. However, Plaintiff cancelled that meeting. Pl.

Exhibits Vol. II, Ex. at 5. Moreover, on November 7th, Plaintiff failed to appear for her

meeting with Grizard, which he had rescheduled at her request. It appears that Grizard

again rescheduled his meeting with Plaintiff for November 9th, and that Plaintiff again

failed to attend. *See*, Pl. Exhibits Vol. I, Ex. C, Grizard Dep. at 104-105 ("We had

several attempts. . . . I think there was two meetings that we set up and she never

came for whatever reasons."); Pl. Exhibits Vol. II, Ex. P. In any event, on November 9,

2006, at 3:10 PM, Grizard left a voice message on Plaintiff's phone, stating, in pertinent

---

[7]As will be discussed further below, the clear and indisputable import of this testimony is that
Plaintiff felt that it was necessary to meet with Grizard again, on November 3rd, because he did not
understand that she was claiming to have been sexually harassed. This is also consistent with Plaintiff's
email to Grizard on November 2nd.

part:

> It's 3:10.  I am here with Father (inaudible), mainly because you didn't
> make the meeting, which is the reason why we met.  I have a letter which
> will go to you in the mail, and I will read it to you and explain it to you.  . . .
> I didn't want to do this on the phone, but I was trying to do so at our
> meeting.  You can always call me on my cellular phone.

*Id*., Ex. P.  Furthermore, in this voice message, Grizard read the letter, which informed

Plaintiff that her last day of work would be November 9, 2006, and which also directed

Plaintiff to return property belonging to DOR, including her Rolodex, keys, credit card,

and checkbook. *Id*.; *see also, id.*, Ex. J (Grizard's letter dated November 9, 2006,

informing her that her last day of work would be November 9, 2006, and that DOR

would pay her until November 28, 2006, "in lieu of notice.").  Regarding DOR's decision

to terminate Plaintiff's employment, Grizard stated:

> This decision took place after several no show [sic] from her.  In essence
> she never came to any of the meetings at that point.  Every time we set up
> a meeting she didn't come.  She did not show for the weekend liturgies
> which was a key piece of her work.  So during the Sunday liturgies I was
> told again Father Lance Genyo [sic] who was the presider for that liturgy
> came and of course she was not there fore coordinating the liturgy.  So at
> that point my understanding was she's not going to do the work so she
> better receive a notice in lieu of notice and we can move the transitioning
> faster.

Grizard Dep. at 111-112.

During the period between November 3rd and November 9th, when Plaintiff failed

to appear for work and for meetings with Grizard and Pedeville, she was taking steps to

have Enyan-Boadu arrested, and taking steps to file an EEOC complaint against DOR.

Specifically, on November 5, 2006[8], Plaintiff made a complaint against Enyan-Boadu with the Village of Brockport Police Department. Plaintiff's sworn supporting deposition alleged the following conduct by Enyan-Boadu: 1) on July 2, 2006, he kissed Plaintiff on the lips; 2) between July 2nd and July 30th, Enyan-Boadu touched her breast; 3) on July 30, 2006, Enyan-Boadu kissed her on the lips and attempted to force her to touch his penis; and 4) on October 2, 2006, Enyan Boadu made inappropriate sexual comments. Pl. Exhibits Vol. II, Ex. N. On November 7, 2006, in cooperation with the Brockport Police, Plaintiff wore a concealed microphone during a meeting with Enyan-Boadu, and attempted to have him admit that he sexually abused her. When Plaintiff went to the Brockport Police Department on November 7, 2006, Attorney Agola, who Plaintiff had retained during the preceding week, was present. Pl. Dep. at 469.

The following day, November 8, 2006, Plaintiff filed a complaint against DOR with the U.S. Equal Opportunities Employment Commission ("EEOC"). The EEOC complaint [#53-12] stated that on July 2, 2006, Enyan-Boadu told her that she was "beautiful, like a doll," and kissed her. The complaint further stated that "sometime between July 2, 2006 and July 30, 2006," Enyan-Boadu asked Plaintiff is she was a virgin,[9] and touched her breast. Additionally, the EEOC complaint alleged that "on or about July 30, 2006," Enyan-Boadu grabbed her wrist and attempted to have her touch his penis. The complaint further stated:

---

[8]That same day, Plaintiff failed to attend the Migrant Ministry Mass. Plaintiff admits that she did not attend the Mass.

[9]Affidavits submitted by DOR from persons associated with the Brockport parish indicate that it was Plaintiff who frequently made unsolicited statements that she was a virgin, and that she repeatedly told Enyan-Boadu that he should have a girlfriend.

> After I rejected Pastor Peter's advances, I was given notice of my termination. . . . *I attempted to inform management that Pastor Peter was ruining my life*; I was told that they needed 'collaboration and financial support of Father Peter.' No investigation was commenced. The employee handbook doesn't have any complaint mechanism, nor any definition of what sexual harassment is.[10]

EEOC Complaint [#53-12] (emphasis added). Plaintiff swore to this complaint on November 8, 2006.

On November 10, 2006, Enyan-Boadu was arrested and charged with Forcible Touching and Harassment in the Second Degree under the New York State Penal Code, based on Plaintiff's complaint to the Brockport Police Department. DOR maintains that it had no notice of any allegations of sexual harassment by Enyan-Boadu against Plaintiff prior to the arrest.

Following Enyan-Boadu's arrest, DOR conducted an investigation into the allegations that he had sexually harassed Plaintiff. Plaintiff declined to participate in the investigation.[11] However, DOR interviewed a number of individuals, including Lisa O'Brien ("O'Brien"), who was employed at a neighboring Catholic parish. The report of O'Brien's interview states, in pertinent part:

> Lisa and Sandra [spoke on] November 1st [2006], when Sandra came to [the parish where O'Brien was employed as Youth Minister] for Mass. After Mass they spoke for an hour, when Sandra gave her account of the resignation. She said that at the meeting with Fr. Peter and Bernard, there was anger involved *and yes, she said she quit*. She said she felt ambushed. . . . *Lisa told her the resignation wasn't valid because she*

---

[10]As shown above, this statement was incorrect.

[11]On November 30, 2006, Pedeville wrote to Plaintiff, requesting her assistance in conducting an investigation into Plaintiff's allegations against Enyan-Boadu. *Id.*, Ex. K. Pedeville's letter indicated, in pertinent part: "I attempted to meet with you on two occasions to discuss your resignation of employment; however you cancelled the appointments, I attempted to follow up by telephone. [sic] Unfortunately, you could not speak with me on Sunday, November 18th when I called you." *Id.*

*didn't sign anything*[12] . . . .  There were two subsequent phone
conversations that took place over the next two days.  . . .  The second
phone call is when Sandra told Lisa about the incidents in the summer
where 'Fr. Peter kissed her and he put her hand on his genitals.'  *When
Lisa asked why she didn't report it, she said something to the effect that
we need to forgive and forget.*

[#53-11] at 45 (emphasis added).  DOR also interviewed another individual, Margot Van

Etten ("Van Etten"), who was employed at SUNY Brockport, and documented the

interview as follows:

Monday or Tuesday after the [Dia de los Muertos celebration], Margot
said that Sandra 'looked like a kitten in a dryer and she broke down'
emotionally.  At that point, Sandra anticipated having a meeting with
Bernard and Peter.  Bernard was upset for moving service [sic] t the
Newman Center and Bernard allegedly scolded her for having a
communion service in the absence of a priest.  Sandra asked Fr. Peter
why he reported her to the Diocese? 'Sandra felt no support from the
Diocese, *and said, I quit*.'

Margot says that 2 days later, Sandra looked in worse shape, as it was
her plan to stay  -2 months [sic] to help the ministry find someone else,
and indicated that this was not going to happen.  *It was a this time, that
Sandra told Margot that 'she had never told a soul, but Fr. Peter had been
sexually harassing her.'*

[#53-11] at 51 (emphasis added).

On January 26, 2007, Plaintiff filed a sworn Amended EEOC Complaint [#53-12].

The complaint alleged, in pertinent part,  that on October 30, 2006, Plaintiff and Enyan-

Boadu met with Grizard, at which time Enyan-Boadu called her "a crazy person

possessed with demons."  Plaintiff further stated:

On October 30, 2006, Grizard and I went to my office and *I explained to
him also that 'Father Peter is making my life miserable'  and 'you need to
take action.'  He indicated to me to write everything down such as my*

_____

[12]At Plaintiff's deposition, she was asked if O'Brien told her this, and she responded: "Probably
she said that.  I don't know.  I don't recall that." Plaintiff's Exhibits Vol. I, Ex. A at 294.

*complaints, my thoughts and then we will 'move on from there.' Grizard took no further action.*[13]

Amended EEOC Complaint [#53-12] (emphasis added). The Amended EEOC Complaint did not indicate that Plaintiff complained of sexual harassment during that meeting. The Amended EEOC Complaint further stated that, the following day, October 31, 2006, Plaintiff met with Grizard and Bauer, and that Plaintiff attempted to tell Bauer that she had been sexually harassed:

> *I started to explain* to her about the hostile environment and work conditions in my work place. *I started to complain* about the hostile environment I suffered as a result of Father Peter's harassment of me, and was told by Bauer to 'stop ... stop ... stop ... tell me about it later, I do not want to know about your work environment right now[.]' [S]he then asked me 'are you going to resign?' I told Ms. Bauer, no, that I do not want to resign. Bauer then asked me to sign a document indicating that I would resign; I refused to sign this document.

*Id.* [#53-12] at 2 (emphasis added). Notably, although, in the Amended EEOC Complaint, Plaintiff indicated that she "started to explain" that Enyan-Boadu was "harassing" her, she never alleged harassment of a sexual nature. In any event, the Amended EEOC Complaint further stated that on November 1, 2006, Plaintiff met with Grizard and Flores, at which time she stated that she had not resigned her position. Further, Plaintiff stated, "I then told them that Father Peter *made my life miserable* and Bernard said to me that 'you put yourself in this position.'" (emphasis added) The Amended EEOC Complaint further alleged that on November 2, 2006, Plaintiff sent an email to DOR's Human Resources Office, "indicating that [she] wanted to discuss

---

[13]Again, Plaintiff admits that she never gave Grizard such a written statement.

Sexual Misconduct,"[14] and that she "received no response from the Department of Human Resources." *Id* at 3.[15]  Finally, the Amended EEOC Complaint stated, in pertinent part: "The respondent has attempted to make it appear as though I resigned; the record evidence shows that I *attempted* in earnest to bring my claims of sexual harassment by Father Peter to their attention in October 2006." *Id*. (emphasis added).

On May 14, 2007, Plaintiff commenced the subject action.  The original Complaint [#1] alleged five causes of action: 1) hostile environment discrimination under Title VII; 2) hostile environment discrimination under the NYHRL; 3) retaliation under Title VII;[16] 4) retaliation under the NYHRL; and 5) assault and battery under New York common law.[17]  Similar to the EEOC complaints, the Complaint in this action alleged that Enyan-Boadu made sexual advances to Plaintiff on three occasions in July 2006.  The Complaint stated that Enyan-Boadu was her "co-worker," and that Grizard was her "Supervisor." Complaint [#1] ¶ 31; *see also*, Pl. Memo of Law [#19-2] at 4. Additionally, the Complaint essentially reiterated the allegations in the EEOC complaints.  Namely, the Complaint stated that on October 30, 2006, Plaintiff told

---

[14]The email, which is contained in the record, does not state that Plaintiff wanted to discuss sexual misconduct.  Rather, Plaintiff's message, which was sent as a reply to an email that Pedeville had previously sent out to staff concerning sexual harassment training, merely requested a meeting.

[15]This statement that she "received no response" was clearly false, since, as shown above, and it is undisputed, Pedeville subsequently scheduled a meeting with Plaintiff, but Plaintiff failed to attend.

[16]With regard to her retaliation claims, the Complaint states, at one point, that DOR terminated her employment in retaliation for her complaints. Complaint [#1] at ¶ 55.  However, in the specific sections of the Complaint in which Plaintiff sets forth her retaliation claims, she states that DOR retaliated against her "by failing to take any remedial action whatsoever in regards [sic] to Plaintiff's complaints of sexual harassment through the creation of a hostile work environment at the hands of Pastor Peter Enyan-Boadu as late as one month prior to her termination." [sic] (Complaint ¶ ¶ 76, 81).

[17]The Complaint was signed under Rule 11 by Attorney Agola.

Grizard, "'Pastor Peter is making my life miserable,' and 'you need to take action.'" *Id*. at ¶ 34. The Complaint further stated that on October 31st and November 2nd, she had attempted to complain about sexual harassment during meetings with Grizard and Bauer, and Grizard and Flores, respectively. In that regard, the Complaint stated: "Plaintiff *attempted* in earnest to bring her claims of sexual harassment by Pastor Peter Enyan-Boadu to defendant's [DOR's] attention in October of 2006." *Id*. at ¶ 54 (emphasis added). Additionally, the Complaint stated that on November 2nd, Plaintiff sent an email to DOR's Human Resources Office, referencing sexual misconduct. *Id*. at ¶ 47.

On July 19, 2007, the criminal charges against Enyan-Boadu were tried in Town Court in the Town of Sweden, New York, in which the Village of Brockport is located. At trial, Plaintiff testified under oath. As a preliminary matter, Plaintiff testified, without any equivocation, that her "boss" was Grizard:

> Q. And who – at either the Church or at the ministry, who was your immediate boss?
>
> A. My immediate boss?
>
> Q. Yeah.
>
> A. It's Bernard Grizard.

Criminal Trial Transcript ("CTT") at 24.[18] Plaintiff then testified concerning her allegations against Enyan-Boadu. Plaintiff stated that on July 2, 2006, Enyan-Boadu grabbed her shoulders and kissed her. *Id*. at 32. Plaintiff also indicated that on July 23,

---

[18] Grizard also testified that Enyan-Boadu was not Plaintiff's supervisor. Criminal Trial Transcript at 249.

2006, Enyan-Boadu cornered her, kissed her, and attempted to force her to touch his penis. *Id*. at 43. Plaintiff testified that subsequent to those two events, Enyan-Boadu "continued bothering me . . . with comments about my marriage, about my sexual life, about if I am a virgin, about if I have sex with my husband." *Id*. at 59. On cross-examination, Enyan-Boadu's attorney asked Plaintiff if she told Grizard about these alleged events when she met with him on August 8, 2006, for her annual performance review, and Plaintiff answered as follows:

> Q. So at that meeting with Bernard Grizard, did you at any time tell him about these allegations that you made about Father Peter?
>
> [There was an objection by the Prosecutor]
>
> THE COURT: I'm going to allow that one question.
>
> Q. Did you make a complaint to Mr. Grizard?
>
> A. I told him that Peter Enyan-Boadu is making my life miserable and he had to do something.
>
> Q. Is that the extent of what you told him?
>
> A. Because Peter Enyan-Boadu treating me – is going to damage my family or do something to my family.
>
> Q. You told that to Mr. Grizard?
>
> A. I told Mr. Grizard that Peter Enyan-Boadu is making my life miserable.[19]

Criminal Trial Transcript at 102-104. As can be seen, Plaintiff testified, contrary to her prior pleadings, that she made the complaint about being "miserable" on August 8,

---

[19]As noted above, Plaintiff had previously indicated, both in sworn EEOC complaints and in her Complaint in this action, that she had made the "making my life miserable" comment to Grizard on October 30, 2006. Now, for the first time, Plaintiff indicated that she had made the "miserable" comment to Grizard in August 2006.

2006, instead of October 30, 2006. Subsequently, while still on cross-examination, the following exchange occured:

> Q. Now, did you ever tell Bernard Grizard that you were afraid of what Father Peter might do to you?

> [There was an objection by the Prosecutor, which was overruled]

> A. I told Bernard Grizard that he was making my life miserable.

*Id*. at 137. Although Plaintiff's responses concerning the August 8th meeting were somewhat equivocal, on re-direct by the Prosecutor, Plaintiff indicated that she did not make *any* complaint about the alleged sexual harassment by Enyan-Boadu at the August 8 meeting, or at any time prior to October 2006, because she was "scared" to do so:

> Q. And my last question, Sandra, is *why didn't you ever tell anyone what happened until some time in October?*

> A. I was threatened by him. I was scared.

> ***

> Q. Any other reasons why you didn't tell anyone?

> A. I thought that after I got married he's going to respect me and pull back.

Criminal Trial Transcript at 152-153 (emphasis added). Plaintiff further testified that she never told Grizard that she was afraid of Enyan-Boadu:

> Q. Now, did you *ever* tell Bernard Grizard that you were afraid of what Father Peter might do to you?

> A. I told Bernard that he was making my life miserable.

> Q. That's not my question. My question was: Did you tell Bernard Grizard that you were afraid of Father Peter, that he might hurt you?

> A. No.

*Id*. at 137 (emphasis).   At the conclusion of the bench trial,[20] the Court acquitted

Enyan-Boadu of the charges against him.

Defendants subsequently filed motions to dismiss the Complaint in this action,

and on May 19, 2008, the Court issued a Decision and Order [#28], granting the

applications in part, denying them in part, and granting Plaintiff leave to replead.  In the

Decision and Order, the Court observed that, "Plaintiff indicates that Enyan-Boadu was

her 'co-worker,' as opposed to her 'supervisor,' and she does not indicate that he had

any supervisory authority over her. (Complaint [#1] ¶ 31; Pl. Memo of Law [#19-2] at 4)."

*Id*. at 2.  The Court also summarized Plaintiff's claims, in pertinent part, as follows:

> [O]n October 30, 2006, Plaintiff told her supervisor, Bernard Grizard
> ("Grizard"), DOR's  Director of Parish Support Ministries, that he "need[ed]
> to take action," because Enyan-Boadu was "making [her] life miserable."
> (Complaint [#1] ¶ 34).  *The Complaint does not indicate that Plaintiff said
> anything to Grizard regarding sexual harassment*.  The following day,
> October 31, 2006, Plaintiff met with Grizard and Mary Bauer ("Bauer"),
> who worked in DOR's Human Resources Department.  Plaintiff "started to
> explain to Bauer about the hostile environment and work conditions in her
> work place as a result of [Enyan-Boadu's] harassment, but was told by
> Bauer to "stop . . .  stop . . . stop . . . tell me about it later, I do not want to
> know about your work environment right now." (*Id*. at ¶ 38).  Bauer then
> asked Plaintiff to sign a letter of resignation, but Plaintiff refused.  The
> following day, November 1, 2006, Plaintiff again met with Grizard, and
> again told him that Enyan-Boadu had "made her life miserable," *though,
> again, the Complaint does not indicate that she said anything about
> sexual harassment*. (*Id*. at ¶  43).  Grizard allegedly then presented
> Plaintiff with a letter dated October 31, 2006, stating that she had
> resigned, and told her that her employment would be terminated on
> November 28, 2006.

---

[20]The Honorable Carl Coapman, Sweden Town Justice, presided over the bench trial.  In
Plaintiff's memo of law submitted in opposition to Enyan-Boadu's summary judgment motion, Plaintiff's
attorney attempts to chide Enyan-Boadu's counsel, stating: "Defendant Enyan-Boadu's statement that
Judge Carl Coapman is the "Finder of Fact" is equally puzzling, as it is well-settled that juries are finders of
fact." [#61-1] at 5.  Such a statement causes the Court to wonder whether Plaintiff's papers were prepared
by someone with legal training.  However, since the submission was signed by Plaintiff's attorney, Ms.
Agola, the Court informs her that at a bench trial, the judge acts as the trier of fact.

On November 2, 2006, Plaintiff sent an email to Grizard, indicating that she was not resigning. However, on November 9, 2006, Grizard informed Plaintiff that her employment was terminated. Also on November 2, 2006, Plaintiff sent an e-mail to DOR's Human Resources office, indicating that she "wanted to discuss 'sexual misconduct,'" *which appears to have been the first time that DOR received notice of such alleged misconduct involving her*. (*Id*. at ¶ 47).[21] The Human Resources office, though, did not respond until November 30, 2006, when it contacted Plaintiff to perform a "post-termination investigation" of her complaint of sexual harassment. (*Id*. at ¶ 52).[22] Apparently, however, such post-termination investigation did not proceed, because Plaintiff's counsel directed DOR to have no contact with her client.

Decision and Order [#28] at 2-4 (emphasis added).

On May 29, 2008, Plaintiff filed an Amended Complaint [#29], which is now the operative complaint in this action. The Amended Complaint alleges claims against all Defendants for hostile work environment discrimination and retaliation, under Title VII and the NYHRL,[23] and also asserts a claim for common-law battery against Enyan-Boadu. The Amended Complaint essentially differs from the original Complaint in that it includes additional detail concerning the alleged harassment by Enyan-Boadu between July 2006 and October 2006 (Amended Complaint [#29] at ¶ ¶ 29, 30-49). As with the original Complaint, the Amended Complaint alleges the same time line as far as the notice that she gave to DOR concerning the harassment. Specifically, Plaintiff alleges

---

[21]At that time, the Court did not have the actual email that Plaintiff sent. Now that the Court has seen the email, it seems clear that the message did not give DOR notice that Plaintiff was being sexually harassed. Instead, Plaintiff was replying to an email that had been sent out by DOR concerning sexual harassment *training*. Plaintiff did not indicate in her reply email that she was being sexually harassed by anyone.

[22]The Court based this statement on the allegations of the Complaint. The Court was not aware, at that early stage of the litigation, that Pedeville had responded to Plaintiff and had set up a meeting.

[23]The Title VII and NYHRL claims all indicate that Plaintiff is seeking damages from "all defendants."As discussed further below, Plaintiff now indicates, in opposition to Enyan-Boadu's summary judgment motion, that she is not asserting claims against him under Title VII or the NYHRL.

that on October 30, 2006, she told Grizard, "Pastor Peter is making my life miserable and you need to take action." *Id*. at ¶ 53. Additionally, she alleges that on October 31, 2006, she "started to explain" to Bauer that she was being harassed, but Bauer stopped her, saying, "'stop ... stop ... stop ... tell me about it later, I do not want to know about your work environment right now." *Id*. at ¶ 57. Plaintiff further alleges that on November 2, 2006, she sent an email to DOR's Human Resources Office, "regarding 'sexual misconduct *education*,'" and that she wanted an appointment to speak to someone the following day, after her meeting with Grizard. *Id*. at ¶ 64. Moreover, Plaintiff alleges that on November 3rd, she met with Grizard and Fr. Jesus Flores, at which time she stated that she loved her job and was not resigning. *Id*. at ¶ ¶ 65-67. Plaintiff indicates that she received no response to her email from DOR's Human Resources Office, and that as a result she went to the police. *Id*. at ¶ 68-70.[24] Significantly, similar to the original Complaint, the Amended Complaint does not allege that, during the aforementioned meetings, Plaintiff ever actually informed anyone at DOR that she was being sexually harassed. Instead, the Amended Complaint indicates only that Plaintiff told Grizard, on October 31st and November 3rd, that Enyan-Boadu was "making her miserable."

On February 18, 2009, Plaintiff filed a sworn Response to Defendant's First Set of Interrogatories. [#53-12]. In pertinent part, for interrogatory number three, Plaintiff was asked the following question, and gave the following response:

---

[24]Yet again, Plaintiff's suggestion that she never received a response from Pedeville is demonstrably false. While the response may not have come in the form of an email, she clearly received a response from Pedeville, who granted Plaintiff an appointment, which Plaintiff failed to keep. Consequently, Plaintiff's suggestion that she had to go to the police because Human Resources ignored her is also demonstrably false.

Describe each occasion on which the plaintiff complained to the defendants about the conduct described in response to Interrogatory No. 1. Or otherwise opposed or objected to the conduct. Identify the complaint, state when and whom the plaintiff complained about or otherwise objected to or opposed the alleged conduct and *describe in detail the substance of the complaint* or opposition as well as the defendants' response to such complaint or opposition.

*Response*: In addition to all of her complaints to Pastor Peter Enyan-Boadu when was sexually harassing her, on October 30, 2006, Plaintiff met with Bernard Grizard, her supervisor, along with her co-worker Pastor Peter Enyan-Boadu to complain about his conduct. At that meeting, Pastor Peter Enyan-Boadu called Plaintiff a 'crazy person possessed with demons' in from of Supervisor Grizard. Supervisor Grizard did not initiate any complaint on Plaintiff's behalf, despite his position as Plaintiff's supervisor, and the fact that he witnessed Pastor Peter Enyan-Boadu's conduct first hand. *On that same day, October 30, 2006, Supervisor Grizard and Plaintiff went to her office where she expressed to him that 'Pastor Peter is making my life miserable' and 'you need to take action.' Supervisor Grizard told Plaintiff that she needed to express her complaints in writing and that they would move on from there.* However, Supervisor Grizard took no further action to investigate Plaintiff's complaint.

DOR's Exhibits [#53-12], Ex. 30 at 7-8 (emphasis added). Notably, this sworn response indicates that the *only* complaint that Plaintiff ever made to DOR was on October 30, 2006, and that all she said was, 'Pastor Peter is making my life miserable' and 'you need to take action.' The response does not indicate that Plaintiff complained of sexual harassment to Grizard or Bauer. Moreover, as noted above, elsewhere in the record Plaintiff admits that she never provided Grizard with a written statement.

As part of the same set of interrogatories, Plaintiff was asked to give a detailed description of any retaliation that she suffered:

Describe each occasion in which the defendants subject the plaintiff to retaliation, based on her complaints of sexual discrimination, harassment, hostile environment or the plaintiff's engaging in any other protected activity. Include date, time, and place of each and every occasion, the identity of the person or persons who engaged in the allegedly retaliatory

behavior, the identity of any person who observed or otherwise witnessed the allegedly retaliatory behavior, the identity of the individual who was the subject of the alleged retaliation, and a detailed description of the alleged retaliation itself.

[#53-12] at 29 (Interrogatory 5). With regard to DOR, Plaintiff's sworn response was

essentially the same description that she provided in her original Complaint and

Amended Complaint:

> [O]n October 30, 2006, Plaintiff met with Bernard Grizard, her supervisor, along with her co-worker Pastor Peter Enyan-Boadu to complain about his conduct. At that meeting, Pastor Peter Enyan-Boadu called Plaintiff a "crazy person possessed with demons" in front of Supervisor Grizard. Supervisor Grizard did not initiate any complaint on Plaintiff's behalf, despite his position as Plaintiff's supervisor, and the fact that he witnessed Pastor Peter Enyan-Boadu's conduct first-hand. Defendant's [sic], therefore, took no remedial action with regards to Plaintiff's complaints. Plaintiff was further dissuaded from making complaints of discrimination. On that same day, October 30, 2006, Supervisor Grizard and Plaintiff went to her office where she expressed to him that "Pastor Peter is making my life miserable," and "you need to take action." Supervisor Grizard told Plaintiff that she needed to express her complaints in writing and that they would move on from there. However, Supervisor Grizard took no further action to investigate Plaintiff's complaint. On October 31, 2006, Supervisor Grizard called Plaintiff for a meeting where he introduced her to Mary Bauer of the Human Resources Department. Plaintiff started to explain to Bauer her good faith belief that she was subject to a hostile work environment as a result of Pastor Peter Enyan-Boadu's harassment, but was told by Bauer to "stop ... stop ... stop ... tell me about it later, I do not want to know about your work environment right now." Bauer then asked Plaintiff "are you going to resign?" Plaintiff told Ms. Bauer, "no," that she did not want to "resign." Bauer then asked Plaintiff to sign a document indicating that she would resign; Plaintiff refused to sign this document. Bauer did not initiate any investigation based on Plaintiff's complaints about Pastor Peter Enyan-Boadu.

[#53-12] at 31-32, Pl. Response to Interrogatory 5.

Months after submitting her sworn interrogatory responses. Plaintiff was deposed

over a period of three days. During this deposition, Plaintiff gave testimony that was

inconsistent with her prior pleadings and her sworn criminal trial testimony, in several

respects.  On April 7, 2009, Plaintiff was deposed by DOR's attorney.  On that day,

Plaintiff indicated that Grizard was her supervisor, but that she was confused, and that

Enyan-Boadu might also have been her supervisor. Pl. Dep. 4/7/09 t 84-85.  Plaintiff

further testified that it was on August 8, 2006, during her annual performance review,

she told Grizard that Enyan-Boadu was making her miserable:

Q. Okay.  When you met with Mr. Grizard –

A. Yes.

Q. – in August of 2006 . . .  was there anything other than your evaluation that you spoke about?

A. I mention that the priest in Nativity was making my life miserable and he need to so something.

***

Q. And you reviewed your evaluation?

A. We were talking in general.  We didn't go point by point.  He was just reading, signing and he was – all those things like that.

Q.  Okay.  So at some point you talked about the priest at Nativity was making life miserable?

A.  Miserable.

Q. And what did he say or what did you say and what did he say?

A. He said to me that first, he's a priest.  And second, that he's going to have lunch with him to talk about it.

Q. Okay.  Anything else?

A. No.

Q. And you said to him that the priest is making life miserable for you?

A. Yes.

Q. Did you say anything else?

26

A. No.

[#53-3] at 3-4.  In this regard, although Plaintiff indicated that she made the "miserable"

comments in August, as opposed to November,[25] she still did not indicate that she told

Grizard that she was being sexually harassed.  Later during the deposition, though,

Plaintiff added that, also during the August 8th meeting, she told Grizard that Enyan-

Boadu was "touching" her:

Q. . . . [D]id you ever tell anybody at that point that you were being sexually assaulted?

A. Bernard.  The Diocese knew it.

Q. How did they know?

A. My life was making miserable.  I was just crying with them.

Q. But did you ever tell them you were being sexually assaulted?

A. I said that Father Peter was touching me.

Q. Now, you're under oath now.  You understand that?

A. Yes.

Q. Are you telling me that you said that Father Peter was touching you –

A. Touching me, yes.

Q. When?

A. I said to Bernard in the meeting on August 8th, "He's making my life miserable."

Q. What else?

A. "And he's touching me."

---

[25] Plaintiff indicated initially at the criminal trial that she made such a statement in August 2006, but later recanted that testimony on re-direct.

Q. And that's your testimony?

A. Yes.

Q. Okay.  What was his response?

A. He's going to have lunch with him and he's a priest.

[#53-3] at 14-15.  Plaintiff also added, for the first time, that at some point prior to September 2006, she told Grizard that she wanted to move her office to the Newman Center at SUNY Brockport, because her life was in danger at Nativity Church from Enyan-Boadu. Pl. Dep. at 173-175.  Plaintiff further indicated that she telephoned Grizard on October 30th,  not because of the dispute over the Dia de los Muertos Mass, but because she was being sexually assaulted:

> Q. Okay.  An was your purpose in calling him [Grizard] that morning to head off a call from Father Peter?
>
> A. No.  I going to be sexually assaulted for the third time, for the fourth time.  I don't know how many times.
>
> ***
> Q. Okay.  So what did you say [at the meeting]?
>
> A. I was sitting there and I told the two of them – I said this is going to – "This is what is going on, Bernard."  And then I accuse Father Peter that he's touching me and kissing me.[26]

Plaintiff's Exhibits, Vol. I, Ex. A at 194-196; *see also, id*. at 198.  Plaintiff further testified that she never indicated that she was quitting her job. *Id*.

During the deposition, Plaintiff agreed that she failed to attend a meeting with Grizard on November 3, 2006. Plaintiff's Exhibits, Vol. I, Ex. A at 226; [#53-5] at 23-24.

---

[26]None of Plaintiff's earlier pleadings or testimony alleged that she said anything to Grizard on October 30th about touching or kissing.

She also stated that she skipped meetings with Pedeville and Grizard, on November 6th and November 7th respectively, for various reasons, including that her sister was sick, it was supposed to be her day off, and she was emotional. *Id*. at 226-228, 238-241. It is important to note that it was Plaintiff herself who rescheduled the meeting with Grizard for November 7, 2006, and who asked for the meeting with Pedeville on November 6, 2006. *Id*. 238-240. However, Plaintiff cancelled both meetings. *Id*. at 240-241. Most significantly, Plaintiff indicated that she had wanted the meeting with Pedeville to tell her about "the sexual attacks." *Id*. at 262.

Also during her deposition by DOR's attorney on April 7, 2009, Plaintiff testified concerning her meeting with Grizard and Bauer, and in particular, about her claim that Bauer prevented her from complaining about sexual harassment during the meeting:

> I get into the meeting. I didn't know who this woman was physically. I never met her in my life. I didn't know many people of the Diocese. I was working in the third floor and I didn't know all the employees. I didn't know she was Human Resources person. It was this woman there and she ask me if I going to resign and I said no. And I start just crying and said "No. I don't want to resign." And I said in front of Bernard, "I don't want to resign." And then she said to me – and I said "Well, if you are here, I going to tell you about this in the moment." And she put her hand and said "Stop, stop. I'm not here for that. Don't tell me that. Sign this paper." And she want to give me a paper. I was there and I said to Bernard – I said to Bernard and I said to that woman, I said "Do you know what? Mentally, I cannot sign anything. Emotionally, I cannot sign anything. I could not sign anything. What are you asking me to sign? Sign what?"

[#53-4] at 42-43. This testimony, which purports to state exactly what Plaintiff said to

Bauer, does not mention Enyan-Boadu or sexual harassment.[27]

On June 30, 2009, Plaintiff was deposed by Enyan-Boadu's attorney. Plaintiff was asked several questions concerning whether she reported the alleged harassment to the Diocesse.  Contrary to her prior deposition testimony, Plaintiff essentially reverted to the testimony that she gave on re-direct at the criminal trial, and indicated that she did not report harassment by Enyan-Boadu prior to October 2006, because she was afraid.  Upon further questioning, she testified that she could not recall whether she complained to Grizard about sexual harassment in August 2006:

> Q. Following [the alleged harassment by Enyan-Boadu on] July 2nd, 2006, did you report that incident to Mr. Grizard?
> 
> ***
> 
> A. I don't want to take the question out of the context.  The context is that Peter Enyan threatened me.  He threatened me.  How can I report when he threaten me?  That's my answer to you, sir.
> 
> ***
> 
> Q. Did you report the incident of July 23rd, 2006 to Mr. Grizard?
> 
> A. He threatened me.  When he threatened me I couldn't.  I couldn't report to Mr. Grizard.
> 
> Q. Did you report the incident to the Brockport Police?
> 
> A. I did.
> 
> ***
> 
> Q. On August 8, 2006 did you meet with Mr. Grizard at the Diocesan office?
> 
> A. I don't recall.  I need to see a calendar.  I can't  – I met with Mr. Grizard *on the 30* telling Mr. Grizard that Peter Enyan-Boadu sexually assaulted me.  Peter Enyan-Boadu was telling Mr. Grizard telling him [sic] and Peter Enyan said that I'm possessed by demons and that I'm a crazy person.  So I had the meeting with Mr. Grizard on October 30th.  I spoke with him

---

[27] Notably, this detailed testimony is contrary to Plaintiff's conclusory statement, in her Amended EEOC Complaint, that she "started to explain to [Bauer] about the hostile environment and work conditions in my work place."

on the 31st.  I talked to Father Jesus on November 1st and Mr. Grizard.

***

Q. On August 8th, 2006 did you meet with Mr. Grizard?

A. I have to clarify that English is my third language and sometimes I don't understand questions and I don't recall the time, sir.

Q. You do not recall meeting with Mr. Grizard on August 8th, 2006 at the Diocesan Office?

A. I don't recall.  I have several meetings and I don't recall specific days.

***

Q. All right.  And now as you look at this [Deposition Exhibit 13, Plaintiff's performance evaluation] do you recall whether or not you at that time [August 8, 2006] made any complaints to Mr. Grizard about sexual harassment?

A. Attorney Schiano, you ask me the same question in the criminal case and I want to answer same way to you that I make some complaints to Mr. Grizard.[28]

Q. No, I'm --

A. I did.

Q. And I'm talking about this date August 7th or August 8th when you met at the Pastoral Center with Bernard Grizard and I've given you Exhibit 13 – or your attorney has.

A. Yes.

Q. And looking at Exhibit 13 is there any reference in there to any sexual harassment?

A. I don't recall at this time.

Q. Okay.  *Now, your testimony is you don't recall whether on August 7 or August 8 you complained of any sexual harassment to Mr. Grizard; is that correct?*

A. *That's correct.*

---

[28]Of course, Plaintiff testified at the criminal trial that she did not tell anyone about the alleged sexual harassment until October 30, 2006, because she was fearful.

Pl. Exhibits Vol. I, Ex. A at 484-546 (emphasis added). Plaintiff further indicated, during the deposition, that she was not sure who her supervisor was. *Id*. at 507 ("They never clarify who was my boss. I reported to [Grizard], to Peter Enyan-Boadu, to Father Flores. So who was my boss, sir, I don't know.").

On January 28, 2010, Defendants filed the subject motions for summary judgment [#51][#52]. Enyan-Boadu's motion is made pursuant to FRCP 56, or alternatively, pursuant to FRCP 12(b)(6). Enyan-Boadu demands judgment on the hostile environment claims and retaliation claims under Title VII, since he is not an "employer" under that statute. Enyan-Boadu further contends that he cannot be directly liable under the NYHRL, because he is not an employer, and also contends that he cannot be liable under that statute as an aider and abettor, since Plaintiff cannot establish that DOR committed a primary violation. Additionally, Enyan-Boadu contends that the Court should decline to exercise subject-matter jurisdiction over any remaining state-law claims, and dismiss them pursuant to 28 U.S.C. § 1367(c). Enyan-Boadu does not make any substantive argument regarding the merits of Plaintiff's state-law battery claim against him.

DOR maintains that it cannot be liable for any hostile work environment created by Enyan-Boadu, since he was not Plaintiff's supervisor, since DOR provided Plaintiff with an avenue of complaint which she did not use, and since it had no notice of the alleged harassment until after the fact. DOR also contends that the Court lacks subject-matter jurisdiction over Plaintiff's retaliation claim, pursuant to the "ministerial exception." On this point, DOR maintains that the exception applies, because "the dispute that led to Plaintiff leaving the Diocese had its genesis in a religious matter

involving the Day of the Dead liturgy on October 30, 2006." DOR Memo of Law [#54] at 19. Additionally, DOR states that "the reason [it] ended Plaintiff's employment on November 9, 2006 was its belief that she no longer had the ability to serve the ministerial needs of the Hispanic migrant population." *Id*. According to DOR, "[t]he Court is prohibited from considering whether that reason was false and pretextual because to do so would constitute impermissible entanglement with religious doctrine." *Id*. (citation and internal quotation marks omitted). Alternatively, DOR argues that Plaintiff cannot establish a prima facie case of retaliation, since she did not engage in protected activity, and since there is no causal connection between any protected activity and the termination of her employment. DOR further indicates that even assuming Plaintiff can demonstrate a prima facie case of retaliation, she cannot show that DOR's reason for terminating her employment was pretextual.

In support of its motion, DOR relies, *inter alia*, on affidavits from Grizard [#53-6] and Bauer [#53-7].[29] Grizard's affidavit states, in pertinent part, the following: 1) Plaintiff and Enyan-Boadu each complained about each other to him, concerning problems over the use of the Nativity Church facilities;[30] 2) Plaintiff never told him that Enyan-Boadu was sexually harassing her, and in particular, she never stated that Enyan-Boadu had touched her or kissed her; 3) on October 30, 2006, Plaintiff resigned; 4) Grizard told Plaintiff to think about it overnight, but the following day, October 31,

---

[29] Enyan-Boadu did not submit a statement of facts under Local Rule 56.1 or a Memorandum of Law, but instead, relies upon, and incorporates by reference, DOR's submissions.

[30] Grizard testified at his deposition that Enyan-Boadu was not Plaintiff's supervisor. Grizard Dep. at 66.

2006,  Plaintiff reiterated that she resigned; 5) on November 1, 2006, Plaintiff indicated again that she resigned, though she later called Grizard and stated that she had not formally resigned because she did not resign in writing; 6) Grizard made an appointment to meet with Plaintiff on November 3, 2006; 7) on November 2, 2006, Plaintiff sent Grizard an email, reiterating that she had not formally resigned, and stating that she hoped he would understand her better after the meeting on November 3rd; 8) on November 3rd, Plaintiff called and asked that the meeting be rescheduled, and Grizard rescheduled the meeting or November 7, 2006; 9) on November 5, 2006, Plaintiff failed to attend the Migrant Ministry Mass, which was part of her job duties; 10) on November 6, 2006, Plaintiff cancelled the meeting that she had scheduled with Pedeville; 11) on November 7, 2006, Plaintiff failed to attend her meeting with Grizard, and when Grizard telephoned her, she stated that she had forgotten the time; 12) Plaintiff did not perform any work for DOR after November 2, 2006; 13) on November 9, 2006, Grizard notified Plaintiff that her employment was terminated, and that she would be paid through November 28, 2006; and 14) Grizard did not learn of Plaintiff's accusations against Enyan-Boadu until after Enyan-Boadu was arrested. [#53-6]

Bauer states in her affidavit, in pertinent part, the following: 1) Plaintiff was provided with DOR's written policies on sex harassment, and also received training on sexual harassment; 2) on October 31, 2006, Plaintiff told Bauer and Grizard that she resigned; 3) when Bauer told Plaintiff that her resignation would be effective in thirty days, pursuant to DOR's usual policy, Plaintiff indicated that she wanted to work through the end of 2006, and declined to put her resignation in writing; 4) Bauer again asked Plaintiff if she wanted to resign, and Plaintiff stated that she wanted to resign, but

34

that she wanted to work until the end of the year; 5) Grizard told Plaintiff that her last day of work would be November 28, 2006; 6) Plaintiff never indicated that she was being sexually harassed by anyone, and did not mention Enyan-Boadu; 7) on November 2, 2006, Plaintiff sent an email to Pedeville, asking her to schedule a meeting on November 3, 2006; 8) the subject line of Plaintiff's email to Pedeville stated, "Sexual Misconduct Education/Awareness Workshops"; 9) Pedeville was not in her office on November 2nd, and subsequently scheduled a meeting with Plaintiff on November 6, 2006; 10) Plaintiff did not attend her meeting with Pedeville; 11) Bauer did not learn of Plaintiff's accusations against Enyan-Boadu until after Enyan-Boadu was arrested; 12) following Enyan-Boadu's arrest, Pedeville conducted an investigation, in which Plaintiff declined to participate; and 13) as part of her investigation, Pedeville interviewed Lisa O'Brien, who stated that on November 1, 2006, Plaintiff told her that she had resigned her position, and O'Brien advised Plaintiff that her resignation was not effective if she did not make it in writing.

In opposition to Enyan-Boadu's motion, Plaintiff indicates, at the outset, that she is not asserting claims against him individually under Title VII or NYHRL.[31] Pl. Memo of Law [#61-2] at 3-4 ("Plaintiff has not plead individual liability as against Peter Enyan-Boadu under Title VII or the NYSHRL.")  Accordingly, Enyan Boadu is granted summary judgment on all Title VII and NYHRL claims, and the only claim remaining against him is the state-law battery claim.  Plaintiff's papers do not address Enyan-Boadu's argument

---

[31] Plaintiff  contends, though, that the Court should deny Enyan-Boadu's motion, since he has not submitted a separate statement of facts and memo of law.  However, Enyan-Boadu has joined in DOR's motion, and adopts DOR papers as his own.

that the Court should decline to exercise supplemental jurisdiction over the state-court battery claim, in the event that all federal claims are dismissed.

In opposition to DOR's motion, Plaintiff contends that she has established a prima facie case of hostile environment harassment, and that liability for Enyan-Boadu's actions should be imputed to DOR, since Enyan-Boadu had supervisory authority over her, and since DOR had *constructive* notice[32] of the harassment and failed to take remedial action. Pl. Memo of Law [#60-4] at 8-9. Plaintiff also maintains that her retaliation claim is not barred by the ministerial exception. Additionally, Plaintiff indicates that she has established a prima facie case of retaliation, and that DOR's proffered reason for terminating her employment is pretextual. In support of her opposition, Plaintiff submits, *inter alia*, her own affidavit.[33] The affidavit states, in pertinent part, the following: 1) Plaintiff graduated summa cum laude from college in

_____

[32]In her memo of law, Plaintiff attempts to show that she complained about Enyan-Boadu for two years prior to 2006. In that regard, she states: "Here, prior to August 2006, Rojas complained to Grizard for over two years regarding Father Peter. She also complained to Father Mike Hobson and different staff members and Father Jesus. Rojas said: "he's angry with me because I move the basket, he's angry with me becuase I didn't turn off the light, he's angry with me because of the door, he's angry with me her for this and this and this." Rojas told Grizard this on several occasions." Pl. Memo of Law at [#60-4] at 22. As discussed further below, such general complaints would not constitute protected activity under Title VII. Also as discussed further below, to the extent that Plaintiff is now attempting to argue that she made complaints of sexual harassment at those times, her argument is contrary to her prior sworn statements and pleadings.

[33]Plaintiff also submits nine other affidavits, which are largely, if not entirely, irrelevant and inadmissible. *See*, Pl. Exhibits Vol. III. For example, Plaintiff submits an affidavit from Gary Leistman, whose wife used to work with Enyan-Boadu, stating that Enyan-Boadu was mean to his wife. Leistman also offers observations such as, "I believe that Fr. Peter had pity for himself," and, "Over in Fr. Peter's native country, Ghana, women are dominated." Plaintiff also offers an affidavit from Monica Anderson, who states, in pertinent part, "My perception is that Father Enyan-Boadu was insensitive to the Migrant community." Another affidavit, from Jeanne Rivera, states, in pertinent part: "I observed Father Enyan-Boadu treat Ms. Rojas in a demeaning manner while speaking to her about Religious Education. *He wasn't even her supervisor* and yet he demanded that she ask his permission before she did anything." (emphasis added). Another affidavit, from Kathleen Gilliam, offers this opinion: "I find Ms. Rojas credible because she has the type of personality that a predator can easily take advantage of. Especially one in position of authority at a religious institution." None of the affiants has personal knowledge about whether Plaintiff complained to DOR of sexual harassment.

Mexico and earned a master's degree in theology in the United States; 2) Plaintiff received sexual harassment training from DOR, though the training "never covered what to do if a priest sexual [sic] harasses an employee"; 3) Grizard "was at least one of [Plaintiff's] supervisors and [she] reported to him most of the time," though she "was never clear on who her boss was"; 4) Plaintiff "complained to [her] supervisor Grizard on numerous occasions of the conduct of Father Peter"; 5) on August 8, 2006, Plaintiff told Grizard, "Father Peter was making [her] life miserable and that something needed to be done"; 6) Plaintiff told people that Enyan-Boadu was angry with her; 7) "On August 8, 2006, I told Grizard, 'he's making my life miserable and he's touching me;" 8) at the meeting with Grizard on October 30, 2006, she told Grizard, "Father Peter is touching me and kissing me"; 9) Plaintiff never told Grizard that she resigned; 10) Grizard told Plaintiff to "put everything in writing" to him; 11) on October 31, 2006, Plaintiff "attempted in good faith" to tell Bauer "what my complaints were"; 12) Plaintiff told Grizard that her "life was at risk" at the Nativity parish, but Grizard did not respond; 13) Plaintiff sent an email to Pedeville, asking for a meeting, and never received a response;[34] and 14) Plaintiff cancelled her meetings with Grizard because her sister was sick, she needed a day off, she was crying, and she was upset that Grizard sent out an email telling people that she had resigned.

---

[34]Like so many of Plaintiff's other averments, this statement is directly contradicted by her prior sworn statements. At her deposition, Plaintiff, when asked if she spoke to Pedeville after November 2, 2006, responded, "Maybe I did. I just don't remember exactly those time, those hours." Pl. Dep. at 229. Later, though, during the deposition, Plaintiff admitted that Pedeville had called her and scheduled an appointment: "Q. Did you schedule a time to meet with Barbarba Pedeville? A. *Yes, but she didn't call me immediately*. I don't remember what day we schedule the meeting." Pl. Dep. at 239 (emphasis added). The statement is also internally inconsistent with other statements in Plaintiff's affidavit, since at paragraph 101 of the affidavit, she indicates that she rescheduled her meeting with Pedeville. Astonishingly, still later in her affidavit, Plaintiff again attempts to give the impression that Pedeville ignored her, stating, "Pedeville never responded to my November 2, 2006 email regarding the sexual attack." [sic]

On September 23, 2010, counsel for the parties appeared before the undersigned for oral argument.

ANALYSIS

*Rule 56*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), cert denied, 517 U.S. 1190 (1996). Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The parties may only carry their respective burdens by producing

evidentiary proof in admissible form. Fed. R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

*Plaintiff's Sham Evidence Submitted in Opposition to Summary Judgment*[35]

At the outset, before addressing the merits of the pending motions, the Court must address certain evidence which Plaintiff has submitted. In this regard, the Court is well aware that on summary judgment, it may not resolve issues of credibility. However, this case goes far beyond simple issues of credibility. Rather, upon the entire record, Plaintiff has changed key aspects of her prior version of events, set forth in pleadings, trial testimony, and sworn discovery responses, in an attempt to defeat DOR's summary judgment motion.[36]

It is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124

---

[35]At oral argument, the Court reminded the attorney appearing for Ms. Agola's firm of the Rule 11 caution previously given to her in *Kleehammer v. Monroe County*, No. 09-CV-6177 CJS, — F.Supp.2d —, 2010 WL 3609707 (W.D.N.Y. Sep. 8, 2010).

[36]The Court in no way suggests that Plaintiff's accusations against *Enyan-Boadu* are false. That issue is not before the Court.

(2d Cir. 1987) (citations omitted).

Similarly, a party cannot attempt to defeat a summary judgment motion by contradicting factual allegations in his complaint. *See, Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 -529 (2d Cir. 1985) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding. Accordingly, the district court properly disregarded Universal's affidavits seeking to controvert its own pleading."); *Webadviso v. Bank of America Corp.*, No. 09 Civ. 5769(DC), 2010 WL 521117 at *2 (S.D.N.Y. Feb. 16, 2010) ("[Plaintiff] cannot now take a position, in an effort to defeat summary judgment, that so clearly contradicts the allegations of his own complaint."); *Healy v. City of New York Dept. of Sanitation*, No. 04 Civ. 7344(DC), 2006 WL 3457702 at *5 (S.D.N.Y. Nov. 22, 2006) ("[Plaintiff] cannot create a genuine issue of material fact by contradicting his statements in prior pleadings and prior sworn testimony with a conclusory statement lacking supporting arguments and facts."); *DeSilvis v. National Railroad Passenger Corp.*, 97 F.Supp.2d 459, 462 (S.D.N.Y. 2000) ("A party opposing summary judgment cannot create a triable issue of fact by submitting an affidavit that denies his previously sworn statements or otherwise contradicts his previous testimony. This is also true of affidavits that contradict the facts within the affiant's pleadings that are within his own realm of personal knowledge.") (citations omitted); *Clarke v. JPMorgan Chase Bank, N.A.*, 2010 WL 1379778 at *14 (S.D.N.Y. Mar. 26, 2010) (Rejecting plaintiff's "last-ditch effort" to avoid summary judgment, court held that "it is well established that a party cannot contradict its own pleading with affidavits.") (citations omitted); *Southwick*

*Clothing LLC v. GFT (USA) Corp.*, No. 99 CV 10452(GBD), 2004 WL 2914093 at *6

(S.D.N.Y. Dec. 15, 2004) ("Those factual allegations [in plaintiffs' amended complaint]

are judicial admissions that bind plaintiffs throughout the course of the litigation.

Plaintiffs cannot survive a summary judgment motion by contradicting their own

pleadings in an effort to raise a genuine issue of fact. A complaint cannot be amended

merely by raising new facts and theories in plaintiffs' opposition papers, and hence such

new allegations and claims should not be considered in resolving the motion.")

(citations omitted); *In re Refco Inc., Securities Litigation*, No. 07-MDL 1902(JSR), Nos.

08 Civ. 3086(JSR), 08 Civ. 3065(JSR), 2009 WL 5548666 at *9 (S.D.N.Y. Nov. 16,

2009) ("The allegations . . . have been formally asserted three times, in the original

Complaint, in the Amended Complaint and, most recently, in the proposed Second

Amended Complaint. Plaintiffs are bound by the assertions made repeatedly in their

own pleadings, which now constitute three layers of judicial admissions.") (Report &

Recommendation of Special Master) (citation omitted).

     Moreover, in rare cases, a plaintiff's testimony may be so contradictory and

incomplete that it fails to create a genuine issue of material fact:

> While it is undoubtedly the duty of district courts not to weigh the
> credibility of the parties at the summary judgment stage, in the rare
> circumstance where the plaintiff relies almost exclusively on his own
> testimony, much of which is contradictory and incomplete, it will be
> impossible for a district court to determine whether the jury could
> reasonably find for the plaintiff, and thus whether there are any "genuine"
> issues of material fact, without making some assessment of the plaintiff's
> account. Under these circumstances, the moving party still must meet the
> difficult burden of demonstrating that there is no evidence in the record
> upon which a reasonable factfinder could base a verdict in the plaintiff's
> favor.

*Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).

In this case, based on the foregoing applicable principles of law, the Court disregards several of Plaintiff's factual averments submitted in opposition to summary judgment. Specifically, the Court disregards the following contentions by Plaintiff: 1) that Enyan-Boadu was one of her supervisors; 2) that on August 8, 2006, Plaintiff told Grizard that Enyan-Boadu was making her miserable, or that Enyan-Boadu was touching her; 3) that on October 30, 2006, Plaintiff told Grizard that Enyan-Boadu had touched, kissed, or otherwise sexually harassed her; 4) that Plaintiff told Grizard that Enyan-Boadu was sexually harassing her at any time; 5) that Plaintiff told Grizard that she was in danger from Enyan-Boadu at the Nativity parish; and 6) that Pedeville failed to respond to Plaintiff's request for a meeting.

Plaintiff specifically stated, in both her Complaint and Amended Complaint in this action, that Enyan-Boadu was her co-worker, not her supervisor. Moreover, at the criminal trial, Plaintiff had no difficulty in identifying Grizard as her boss. In fact, throughout the entire record, with the exception of her deposition and affidavit submitted in opposition to summary judgment, Plaintiff, without hesitancy, indicates that Grizard is her supervisor. There is evidence that Enyan-Boadu had control over the Nativity parish building, which DOR and Plaintiff had permission to use. However, there is no evidentiary proof in admissible form that Enyan-Boadu exercised any supervisory authority *over Plaintiff*. Nevertheless, in an attempt to impute liability against DOR for Enyan-Boadu's alleged acts of harassment, Plaintiff now contends that Enyan-Boadu might have been one of her supervisors. This is obviously a sham statement.

42

Similarly, Plaintiff has apparently now recognized another flaw in her case against DOR: She never gave DOR notice of *anything* until after the alleged harassment had ceased, and even then, she said only that Enyan-Boadu was making her "miserable." This fact is consistent throughout Plaintiff's pleadings, her trial testimony, and her sworn interrogatory responses. Plaintiff's attempt to now claim that she told Grizard, on August 8th, that Enyan-Boadu was making her miserable and touching her, and her attempt to claim that she told Grizard, on October 30th, that Enyan-Boadu was touching her and kissing her, is more sham evidence. Clearly, Plaintiff is adding these allegations in an attempt to impute liability against DOR for the alleged hostile work environment, and to establish that she engaged in protected activity.

The record is clear, however, based on Plaintiff's own pleadings and interrogatory responses, that, at most, she attempted to complain to Grizard and Bauer about Enyan-Boadu on October 30th and October 31st. In that regard, on October 30th, Plaintiff told Grizard only that Enyan-Boadu was making her miserable. And, on October 31st, Plaintiff made only some vague complaint about her working conditions. Significantly, though, Plaintiff admitted, in her sworn deposition testimony, that she was frustrated following her meetings with Grizard and Bauer, because they did not understand that she was attempting to complain about sexual harassment. *See*, Pl. Dep. at 219. Plaintiff further admitted that the only reason she scheduled the additional meetings with Grizard and Pedeville, was because she wanted them to understand that Enyan-Boadu had sexually harassed her. Of course, Plaintiff later cancelled those meetings, and never gave Grizard any written statement. Instead, Plaintiff chose to file

43

an EEOC complaint, and to file criminal charges against Enyan-Boadu.  However, it is too late now for Plaintiff to claim that she actually told DOR about sexual harassment.

Plaintiff's eleventh-hour contention that she told Grizard that she was in danger from Enyan-Boadu is another example of sham evidence submitted in the hope of defeating summary judgment.  On this point, as noted above, Plaintiff testified under oath, at the criminal trial, that she never told Grizard  that she was afraid of Enyan-Boadu hurting her. Criminal Trial at 137.

Finally, Plaintiff's contention that Human Resources never responded to her request for a meeting is demonstrably false, and is therefore another blatant example of sham evidence.[37]  In that regard, as discussed in detail above, on or about November 2, 2006, Plaintiff sent an email to Pedeville asking for a meeting.  Plaintiff admits that Pedeville responded to her, and scheduled a meeting, but Plaintiff cancelled the meeting.

With these evidentiary rulings in mind, the Court will proceed to consider the merits of Defendants' applications.

*DOR's Motion to Dismiss the Retaliation Claim Pursuant to the Ministerial Exception*

DOR contends that the Court lacks subject-matter jurisdiction over the retaliation claim, since the Court's examination of the proffered reason why DOR terminated Plaintiff's employment would result in "impermissible entanglement with religious doctrine."  The Court disagrees.  DOR maintains that Plaintiff resigned, and that DOR

---

[37] *See*, Pl. Exhibits Vol. III, Ex. A, Pl. Affidavit at ¶ 86 ("I never received a response from Human Resources."); ¶ 119 ("Pedeville never responded to my November 2, 2006 email regarding the sexual attack." [sic])  (The email subject line referred to sexual harassment *training*, not a sexual attack)

set November 28, 2006 as her last day of work.  DOR contends that subsequently,

Plaintiff failed to appear for work and meetings, which cause DOR to terminate her

employment effective November 9, 2006, though it paid her through November 28th.

DOR does not claim that Plaintiff's termination had anything to do with religious doctrine

or the inner workings of the Catholic Church.  The Court cannot see how its

consideration of Plaintiff's retaliation claim will result in any entanglement with religious

doctrine.  Accordingly, DOR's motion to dismiss the retaliation claim under FRCP

12(b)(1) is denied.

     *Title VII and the NYHRL*

     Title VII "makes it unlawful for an employer to discriminate against any individual

with respect to the 'compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin.'"  *Richardson v.*

*New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations

omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc.*

*Servs.*, 461 F.3d 199 (2nd Cir. 2006).

     Generally, "claims brought under New York State's Human Rights Law are

analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625,

629, n. 1 (2d Cir.1997), cert den. 522 U.S. 997 (1997). Consequently, unless otherwise

noted, references to Title VII below are also intended to refer to the NYHRL. An

exception to this general rule is that individual defendants may be held liable under the

NYHRL, but not under Title VII. Specifically, "[u]nlike Title VII, [NY]HRL § 296(6) has

been construed by the Second Circuit to impose liability on an individual 'defendant who

actually participates in the conduct giving rise to a discrimination claim.' " *Lewis v.*

*Triborough Bridge and Tunnel Auth.*, 77 F.Supp.2d 376, 380 (S.D.N.Y.1999) (*citing*

*Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995), *abrogated on other grounds*

*by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633

(1998)). Under NYHRL § 296(6), an individual co-worker may be held liable as an aider

and abettor, assuming that the employer is found liable under § 296(1). In this regard,

the individual defendant, who may have personally committed the discrimination, is not

held liable for aiding and abetting his own actions, but instead, is deemed liable for

aiding and abetting the primary violation by the employer. *Bennett v. Progressive Corp.*,

225 F.Supp.2d 190, 214 n. 11 (N.D.N.Y.2002). Another difference between Title VII and

the NYHRL is that, "courts have applied a stricter standard under the state and local

human rights laws with regard to the imputation of liability to an employer, requiring that

the employer encourage, condone, or approve of the conduct." *International Healthcare*

*Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F.Supp.2d 345, 361 (S.D.N.Y.2007)

(citations omitted).

*Hostile Environment Discrimination*

DOR maintains that it is entitled to summary judgment on Plaintiff's hostile

environment claims, and the Court agrees. To establish a hostile work environment

claim, a plaintiff must show that

> the harassment was sufficiently severe or pervasive to alter the conditions
> of the victim's employment and create an abusive working environment.
> The plaintiff must show that the workplace was so severely permeated
> with discriminatory intimidation, ridicule, and insult that the terms and
> conditions of her employment were thereby altered. Proving such a claim
> involves showing both objective and subjective elements: the misconduct

shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.

In addition, the plaintiff must show that a specific basis exists for imputing the objectionable conduct to the employer. Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action.[38] According to two 1998 Supreme Court cases, *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), this inquiry differs where the harassment is attributed not to non-supervisory co-workers but to a supervisor with immediate or successively higher authority over the employee. *Burlington Indus.*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. In that circumstance, a court looks first to whether the supervisor's behavior culminated in a tangible employment action against the employee. If it did, the employer will, ipso facto, be vicariously liable. If no such tangible employment action is present, however, an employer will still be liable for a hostile work environment created by a supervisor unless the employer successfully establishes an affirmative defense. That defense requires the employer to show that (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Fairbrother v. Morrison*, 412 F.3d 39, 48-49 (2d Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006).

---

[38] *See also, Murray v. New York University College of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) ("[E]mployer liability for a hostile environment created by coworkers, or by a low-level supervisor who does not rely on his supervisory authority in carrying out the harassment, attaches only when the employer has either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.") (citation and internal quotation mark omitted).

On this claim, the only issue is whether DOR may be held liable for the harassment allegedly perpetrated by Enyan-Boadu. For the reasons discussed above, the Court finds that DOR cannot be held liable for any such harassment. At the outset, there is no triable issue of fact as to whether Enyan-Boadu was Plaintiff's supervisor. Clearly, he was not. Plaintiff worked for a different corporation and reported to her own supervisor, Grizard. At most, Plaintiff had to communicate with Enyan-Boadu, regarding use of the Nativity parish and housekeeping issues related to the fact that Plaintiff had an office at the Nativity campus. Although Plaintiff had to comply with Enyan-Boadu's wishes concerning the physical use of the Nativity buildings, she was not under his supervisory authority.

Moreover, Plaintiff has not shown that DOR knew, or should have known, about the alleged harassment by Enyan-Boadu, and failed to take appropriate remedial action. As already discussed, Plaintiff's only complaint was on October 30, 2006, when she told Grizard that Enyan-Boadu was making her miserable. Plaintiff made this comment in the context of a meeting over the dispute between Plaintiff and Enyan-Boadu concerning the Dia de los Muertos celebration. Grizard could not reasonably have understood Plaintiff's comment to be a complaint about sexual harassment. However, even assuming that Grizard could have somehow understood that Plaintiff was complaining of sexual harassment, the harassment had already stopped at that point. Plaintiff does not allege that any further harassment by Enyan-Boadu occurred after October 30, 2006. Moreover, once DOR learned of Plaintiff's sexual harassment allegations, on or after November 10, 2006, it conducted an investigation, and concluded that the allegations were not true. Furthermore, Plaintiff declined to

48

participate in the investigation.  Accordingly, liability for any harassment committed by Enyan-Boadu cannot be imputed to DOR.

Even assuming, *arguendo*, that Enyan-Boadu was Plaintiff's supervisor,  DOR would still be entitled to summary judgment on the Title VII claims under the *Faragher/Ellerth* affirmative defense.  In that regard, Enyan-Boadu did not take any tangible employment action against Plaintiff.  Additionally, the Court finds as a matter of law, on the entire record, that DOR exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and that Plaintiff unreasonably failed to utilize DOR's complaint procedure.  In that regard, Plaintiff was aware of DOR's sexual harassment policy, but failed to utilize it.  To the extent that Plaintiff now claims that she thought the policy only applied to abuse against children, such a view is not reasonable.

Plaintiff also acted unreasonably in canceling her appointments with Grizard and Pedeville.  In that regard, Plaintiff, upon realizing that Grizard did not understand her vague complaints to be about sexual harassment, scheduled further meetings, with Grizard and Pedeville, to clarify her complaints.  If such meetings had occurred, it is possible that DOR never would have terminated Plaintiff's employment. *See*, Grizard Dep. at 114.  However, Plaintiff cancelled those meetings,  without ever clarifying that she was being harassed.  Accordingly, DOR would be entitled to the *Faragher/Ellerth* affirmative defense.

*Retaliation*

The Court also agrees that DOR is entitled to summary judgment on Plaintiff's

retaliation claims.   The legal principles for such claims are clear:

> "Retaliation claims under Title VII are evaluated under a three-step
> burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d
> 166, 173 (2d Cir.2005); *see also McDonnell Douglas Corp. v. Green*, 411
> U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  First, the
> plaintiff must establish a prima facie case of retaliation by showing: " '(1)
> participation in a protected activity; (2) that the defendant knew of the
> protected activity; (3) an adverse employment action; and (4) a causal
> connection between the protected activity and the adverse employment
> action.' " *Jute*, 420 F.3d at 173 (*quoting McMenemy v. City of Rochester*,
> 241 F.3d 279, 282-83 (2d Cir.2001)). The plaintiff's burden in this regard
> is " de minimis," and "the court's role in evaluating a summary judgment
> request is to determine only whether proffered admissible evidence would
> be sufficient to permit a rational finder of fact to infer a retaliatory motive."
> *Id*. (internal quotation marks omitted).
>
> If the plaintiff sustains this initial burden, "a presumption of retaliation
> arises." *Id*. The defendant must then "articulate a legitimate,
> non-retaliatory reason for the adverse employment action." *Id*. If so, "the
> presumption of retaliation dissipates and the employee must show that
> retaliation was a substantial reason for the adverse employment action."
> *Id*. A plaintiff can sustain this burden by proving that "a retaliatory motive
> played a part in the adverse employment actions even if it was not the
> sole cause[;] if the employer was motivated by retaliatory animus, Title VII
> is violated even if there were objectively valid grounds for the [adverse
> employment action]." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d
> Cir.1990).

*Hicks v. Baines*, 593 F.3d 159, 164-165 (2d Cir. 2010).

It is well settled that "[t]he term 'protected activity' refers to action taken to protest

or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d

560, 566 (2d cir. 2000).  In deciding whether a particular activity amounts to "protected

activity," "the employment practices opposed by the plaintiff need not have actually

amounted to a violation of Title VII.  Rather, the plaintiff must have had a good faith,

reasonable belief that the underlying challenged actions of the employer violated the law." *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001).

Significantly, for purposes of this case, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's [complaint] was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

To make a prima facie showing of an adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d at 207 (*quoting Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006)).

In this case, there is no triable issue of fact as to whether Plaintiff engaged in protected activity. She did not do so. Instead, she merely complained that Enyan-Boadu was "making her miserable." From this vague complaint, DOR could not have reasonably understood that Plaintiff was complaining about conduct prohibited by Title VII. Even Plaintiff admits that, following her meetings with Grizard and Bauer, she did not think that they understood she was complaining about sexual harassment, which is why she scheduled the additional meetings, which she later cancelled.

Even assuming, *arguendo*, that Plaintiff could establish a prima facie case, DOR has proffered a legitimate non-discriminatory reason for terminating Plaintiff's employment.  Namely, DOR maintains that Plaintiff resigned, and that DOR directed that her last day of work would be November 28, 2006.  Subsequently, Plaintiff failed to attend work, including the Migrant Ministry Mass on November 5, 2006, and also failed to attend meetings with Grizard and Pedeville.  According to DOR, as a result of Plaintiff's behavior, it decided to terminate her employment sooner than anticipated, effective November 9th.  Of course, Plaintiff has steadfastly maintained that she never resigned her position, and the Court assumes this to be true for purposes of this motion.  However, Plaintiff does not deny that she failed to attend work or that she cancelled her meetings with Grizard and Pedeville.  In any event, at most, Plaintiff creates a triable issue of fact as to whether DOR's proffered reason is false.  Plaintiff has still not come forward with any evidence that the termination of her employment was related to protected activity.  Consequently, DOR is entitled to summary judgment.

*Plaintiff's State-Law Battery Claim*

The Court has granted summary judgment to Defendants on all claims except Plaintiff's New York State common-law battery claim.  Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise jurisdiction over this claim, and dismisses it without prejudice to Plaintiff re-filing it in state court.  Plaintiff is advised that the statute of limitations governing her state-law claim will be tolled for a period of thirty days, pursuant to 28 U.S.C. § 1367(d). *See, Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir.1998) ( "Section 1367(d)  ensures that the plaintiff whose supplemental state claim is dismissed has at least thirty days after dismissal to refile in state court.").

CONCLUSION

Defendants' applications [#51][#52] are granted. DOR is granted summary

judgment on all claims. Enyan-Boadu is granted summary judgment on all claims,

except Plaintiff's Fifth Cause of Action ("Assault & Battery under New York Law").

Plaintiff's Fifth Cause of Action is dismissed pursuant to 28 U.S.C. § 1367(c).

SO ORDERED.

Dated: Rochester, New York
     October 1, 2010

                                             ENTER:


                                             /s/ Charles J. Siragusa_____
                                             CHARLES J. SIRAGUSA
                                             United States District Judge